Burt DeRIEUX et al., Plaintiff-Appellee,

v.

The FIVE SMITHS, INC., Defendant-Appellant.

The FIVE SMITHS, INC., Plaintiff-Appellant,

v.

William H. HOLLAWAY et al., Defendants-Appellees.

UNITED STATES of America, Plaintiff-Appellee,

v.

The FIVE SMITHS, INC., Defendant-Appellant.

Nos. 5–6 to 5–8.

Temporary Emergency Court of Appeals.

June 20, 1974.

Certiorari Denied Oct. 21, 1974.

See 95 S.Ct. 176.

Emmet J. Bondurant, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga. (Martin E. Kilpatrick, Matthew H. Patton and Susan A. Cahoon, Atlanta, Ga., on the brief) for appellant The Five Smiths, Inc.

James A. Eichelberger, Greene, Buckley, DeRieux & Jones, Atlanta, Ga., for appellee Burt DeRieux.

Paul T. Michael, Atty., U. S. Dept. of Justice (Carla A. Hills, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, on the brief) for appellee U. S.

Before TAMM, Chief Judge, and VAN OOSTERHOUT and HASTINGS, Judges.

HASTINGS, Judge.

These consolidated cases are before us pursuant to § 211(c) of the Economic Stabilization Act of 1970, as amended[1] (the amended Act), upon certification by the district court of substantial constitutional issues. We granted the joint motion of the parties to have the entire cases in Nos. 5–7 and 5–8 presented to us for consideration, and subsequently ordered that No. 5–6 be consolidated therewith. Since it now appears that all facts necessary for a complete adjudication of this controversy have been stipulated,[2] we shall exercise our discretion under § 211(c) to decide the cases in their entirety at this time.[3]

At the heart of all three cases is a single question: did the Atlanta Falcons professional football team violate the Economic Stabilization Act by playing football games during the "Phase I" price freeze at prices which exceeded those

---

[1.] 12 U.S.C.A. § 1904 n. (Supp.1974).

[2.] The parties have jointly filed a stipulation of facts, with exhibits, to which plaintiff in No. 5–6 has filed a "caveat" reserving the right to present evidence on particular issues.

[3.] See United States v. Ohio, Em.App., 487 F. 2d 936, 938 (1973), cert. granted, Fry v. United States, 415 U.S. 912, 94 S.Ct. 1406, 39 L. Ed.2d 466 (1974); National Petroleum Refiners Association v. Dunlop, T.E.C.A., 486 F.2d 1388, 1391–1392 (1973).

charged for games played during 1970? Phase I was initiated by Executive Order 11615, 36 Fed.Reg. 15727 (1971), and was effective during the 90-day period from August 15 through November 13, 1971.

The Five Smiths, Inc. (the Falcons) operate the Atlanta Falcons as a member of the National Football League (NFL). In No. 5–6, the Falcons are defendant in a class action brought by Burt DeRieux, an Atlanta lawyer, on behalf of all season ticket holders for the 1971 Falcons football season. DeRieux originally sought reimbursement of illegal overcharges. By amendment to the complaint he now additionally seeks treble damages, attorneys fees and costs under § 210(b) of the amended Act.

No. 5–7 is an action by the Falcons against the Office of Emergency Preparedness (OEP), its Director and Regional Director, the Cost of Living Council (CLC), the Executive Director and individual members of the CLC, and the Commissioner of Internal Revenue. The complaint seeks declaratory and injunctive relief against the application and enforcement of the Phase I freeze with respect to Falcons 1971 football ticket prices.

Finally, No. 5–8 was brought by the United States pursuant to § 205 of the original Economic Stabilization Act of 1970 [4] (the 1970 Act), to enjoin ticket price violations and to require the Falcons to refund amounts already illegally received.

The docket numbers of the cases reflect the order in which they were filed during September, 1971, all in the Northern District of Georgia. Proceedings in all three cases eventually were stayed, by agreement of the parties, pending the outcome of similar litigation involving University of Southern California season football tickets. See University of Southern California v. Cost of Living Council, T.E.C.A., 472 F.2d 1065 (1972).

A petition for certiorari in *University of Southern California* was denied by the Supreme Court on February 20, 1973, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590. Thereafter, the Government filed motions for summary judgment in Nos. 5–7 and 5–8. Without reaching the merits of the motions, the district court on February 6, 1974 certified the constitutional issues in all three cases to this court.

In 1970, the Falcons' management decided to raise ticket prices for home games during the 1971 football season. The price increases were announced in January, 1971, and amounted to $1.50 and $2.50 per game, depending upon seat location. Prices were not raised for a few "ground" and "field level" seats; however, such seats represented a small percentage of the 58,000-seat capacity of Atlanta Stadium. Sales of season tickets at the new prices were commenced on February 1, 1971, at which time the Falcons mailed order forms for 1971 season tickets to past season ticket holders. By the end of June, 41,590 season tickets had been sold and fully paid for. These tickets were mailed to purchasers on August 2, 1971, and all were delivered prior to August 15, the date the freeze went into effect.

The Falcons played five home games during the freeze, the first of which was a pre-season "exhibition" game. Unlike many NFL teams, the Falcons did not play any exhibition games at home prior to August 15. Of the total number of individual game tickets eventually sold for the five games played during the freeze, 217,151 were sold prior to August 15 (mostly in the form of season tickets) and 45,601 were sold thereafter. The amount of revenue from these five games which is attributable to the challenged price increases is $407,912.00. It is this sum (trebled in No. 5–6) [5] which is the subject of the present litigation.

---

4. Pub.L. 91–379, 84 Stat. .796 (Aug. 15, 1970).

5. Possibly because DeRieux purports to represent season ticket holders only, the recovery sought in 5–6 is somewhat less than three times the $407,912.00 figure.

The Falcons' argument before this court may fairly be described as a frontal assault upon two decisions which have become fixtures in the scheme of economic stabilization law. Amalgamated Meat Cutters & Butcher Workmen v. Connally, D.D.C., 337 F.Supp. 737 (1971) (*Meat Cutters*), decided by a three-judge district court prior to the establishment of the Temporary Emergency Court of Appeals, upheld the constitutionality of the Economic Stabilization Act as it existed in August, 1971, when Phase I was initiated. Even more fundamental to the development of the law of this court has been University of Southern California v. Cost of Living Council, *supra (USC)*. The rather narrow issue decided in that case—whether the Phase I freeze applied to tickets sold prior to the freeze for sporting events occurring during the freeze—apparently has not been laid to rest. See Manning v. University of Notre Dame Du Lac, T.E.C.A., 484 F.2d 501 (1973); Oakland Raiders v. Office of Emergency Preparedness, N.D.Calif. (No. C–71–2213, Jan. 2, 1974), appeal docketed, T.E.C.A. No. 9–11 (March 21, 1974); and *cf.* Murphy v. O'Brien, T.E.C.A., 485 F.2d 671 (1973). Broader reliance has come to be placed upon a more general aspect of *USC*, namely, the opinion's analysis and application of the "great deference test" in the context of economic controls administration. *USC, supra,* pp. 1068–1069. See United States v. IBEW Local 11, T.E.C.A., 475 F.2d 1204, 1209 (1973); Plumbers Local 519 v. Construction Industry Stabilization Committee, T.E.C.A., 479 F.2d 1052, 1056 (1973); Baldwin County Electric Membership Corp. v. Price Commission, T.E.C.A., 481 F.2d 920, 923, cert. denied, 414 U.S. 909, 94 S.Ct. 230, 38 L.Ed.2d 147 (1973); Pacific Coast Meat Jobbers Association, Inc. v. Cost of Living Council, T.E.C.A., 481 F.2d 1388, 1392 (1973); Murphy v. O'Brien, *supra,* p. 674; City of Groton v. Federal Power Commission, T.E.C.A., 487 F.2d 927, 934 (1973);

United States v. Ohio, T.E.C.A., 487 F.2d 936, 941 (1973), cert. granted, 415 U.S. 912, 94 S.Ct. 1406, 39 L.Ed.2d 466 (Feb. 19, 1974). See also, United States v. Lieb, T.E.C.A., 462 F.2d 1161, 1166 (1972), decided prior to *USC*.

In arguing that *Meat Cutters* and *USC* were wrongly decided, the Falcons offer five contentions which form the principal issues common to all three cases now under consideration:

(1) Properly interpreted, Executive Order 11615 does not forbid these price increases;

(2) The Economic Stabilization Act of 1970, as it existed during Phase I, represents an unconstitutional delegation of legislative authority to the executive branch of the Government;

(3) Executive Order 11615 violated § 202(b) of the Economic Stabilization Act;

(4) Executive Order 11615 and the regulations issued thereunder violated § 553 of the Administrative Procedure Act; and

(5) The application of Executive Order 11615 to forbid these price increases represents (a) an unconstitutional bill of attainder or *ex post facto* law; (b) an unconstitutional taking of property without just compensation; and (c) an unconstitutional deprivation of due process of law.

No. 5–6 raises a sixth issue, namely, whether either the 1970 Act or the December 22, 1971 amendments thereto[6] (the 1971 Amendments) created a private right of action to recover for Phase I price violations occurring prior to the enactment of the amendments.

Issues 1 and 2 only were actually litigated in *USC* and *Meat Cutters*. With respect to such issues, the Falcons urge that we overrule *USC* and refuse to follow *Meat Cutters*. The Falcons have mounted their attack with skill and resolve, as evidenced by their principal brief of 155 pages. Still, we are not persuaded. We have concluded that the

---

6. Economic Stabilization Act Amendments of 1971, Pub.L. 92–210, 85 Stat. 743.

Falcons violated a lawful Executive Order issued pursuant to a constitutional statute, and that the ticket price increases must be refunded.

We have further concluded in No. 5–6 that violations of the Order which occurred during the Phase I freeze period are not subject to private actions by individual or class plaintiffs.

## I

Executive Order 11615 and the relevent regulations and interpretations issued thereunder are fully described in the *USC* opinion, 472 F.2d at 1066–1067. We have set out the pertinent section of the Order below.[7] In brief, the Order established a 90-day freeze on prices, rents, wages and salaries, effective August 15, 1971. Permissible price levels were to be determined by reference to the nearest preceding 30-day period during which a "substantial volume of actual transactions" had occurred. Since the Falcons had not played any home football games during the 30 days preceding August 15, the definition of "actual transactions" became crucial in determining the proper "ceiling price" for their upcoming games. If a football game "transaction" did not "occur" until the games were actually played, the ticket price charged during the 1970 season would establish the proper ceiling price for 1971 games.

Cost of Living Council Order No. 1, 36 Fed.Reg. 16215 (Aug. 20, 1971), delegated the CLC's authority to implement the Order to the OEP. Subsequently, the OEP issued Economic Stabilization Regulation No. 1, 36 Fed.Reg. 16515 (Aug. 21, 1971) which elaborated on the

requirements of Executive Order 11615, but was nevertheless "very brief and basic in content." *USC* at 1067. The Regulation defined various terms contained in the Order and Regulation, but did not define the phrase, "actual transactions." By amendment dated August 24, 1971, the Regulation announced that the OEP would from time to time issue "circulars containing implementing instructional material." Circular No. 7, issued September 2, stated that a service transaction occurs "when the service is performed." Nine days later, in Circular No. 11, the OEP issued the statement which was to become the focal point of the *USC* case:

> "The freeze applies to prices of advance sale tickets for sporting events occurring during the freeze."

In *USC* we held that the "implied assertion that a sporting event constituted a service," and the conclusion in Circular No. 11 that the freeze applied to advance sale tickets for sporting events, represented "a reasonable and consistent interpretation of the Executive Order, and one entitled to this court's respect." 472 F.2d at 1072.

### 1. Did USC correctly interpret Executive Order 11615?

The Falcons advance two interpretative arguments. First, they argue that the sale and delivery of the season tickets prior to August 15 constituted completed transactions within the meaning of the Executive Order and Regulation. If so, the Falcons would have been entitled both to retain the full amounts already received and to charge an equally high price for tickets sold after August 15

---

7. "Section 1. (a) Prices, rents, wages, and salaries shall be stabilized for a period of 90 days from the date hereof at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm or other entity of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services. If no transactions occurred in that period, the ceiling will be the highest price, rent, salary or wage in the nearest preceding 30-day period in which

transactions did occur. No person shall charge, assess, or receive, directly or indirectly in any transaction prices or rents in any form higher than those permitted hereunder, and no person shall, directly or indirectly, pay or agree to pay in any transaction wages or salaries in any form, or to use any means to obtain payment of wages and salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise."

(since the pre-freeze sales would have established the proper ceiling price). Second, in the alternative, they contend that irrespective of whether a higher ceiling price was established prior to August 15, the Falcons did not "charge, assess or receive" a price after August 15 with respect to some 41,000 season tickets and therefore the prices of those tickets were exempt from the freeze.

It is conceded that *USC* fully disposed of the first argument adversely to the Falcons. As for their second contention, the Falcons urge that the *USC* court was not presented with the precise argument here put forward. In fact, in Part IV of *USC*, pp. 1069–1070, the court specifically considered and rejected a retroactivity argument. While it is unclear whether the words "charge, assess, or receive" were there given the forceful emphasis accorded them by the Falcons, it is beyond dispute that *USC* undertook to authoritatively interpret the Executive Order in light of a nearly identical set of facts. The Falcons have not brought to our attention any additional factors (such as legislative history) which were not presented in *USC*. They rely entirely upon the text of the Order itself, the relevant portion of which comprises a single paragraph. Under these circumstances, *USC* must be regarded as dispositive of both interpretative arguments here raised.

We subscribe fully to the reasoning and holding of *USC*, and deem it unnecessary to repeat what was set forth in that opinion. In light of the Falcons' strenuous effort to upset *USC*, and because of one factual difference based on the Falcons' status as a *professional* football team, some additional comments directed to two of their arguments are nevertheless appropriate.

■ *First* : The Falcons generally urge that the OEP position with regard to ticket prices was inconsistent with its rulings in other areas, *e. g.*, university tuition, and that even the ticket price policy was reversed for purposes of Phase II. The identical arguments were considered and rejected in *USC* (pp. 1071–1072). We merely note that when the agency was again required to implement a general price freeze at the outset of Phase IV, as opposed to the more flexible system of controls represented by Phase II, it once again interpreted the freeze to apply to advance ticket sales. See CLC Freeze Group Questions and Answers Release No. 4, 38 Fed.Reg. 16651 (1973); and *cf*. Murphy v. O'-Brien, *supra*.

The Falcons also contend that they were subject to a particular inconsistency with regard to the salaries paid to their football players. Falcons players were employed under two separate contracts. The first was a collective bargaining agreement negotiated by the players' union, the NFL Players Association. This agreement established, *inter alia*, the pay schedule for the 1971 pre-season "exhibition" games. The second agreement was the "standard player contract," the salary provisions of which varied and which were negotiated on an individual player basis. The standard player contract provided compensation for the players' services during the regular season of football play. Prior to August 15, the Falcons agreed to pay $117,300 in increased salaries under standard player contracts.

Sometime subsequent to September 7, 1971, OEP Director George A. Lincoln issued an interpretative ruling to the NFL Players Association. The ruling recited that "[a]ccording to a decision of the CLC on September 7, 1971," players who were already in training camps prior to August 15 under 1971 standard player contracts were entitled to receive any increases prescribed therein. We have not been informed of any effort by the Falcons to contest this ruling. The Falcons now argue, however, that the ruling has placed the OEP "in the incongruous position of advocating a price freeze on the sale of tickets without a corresponding wage freeze on the salaries of the players who performed in the same games."

In USC, we stated that "[i]f the haste necessitated [by the freeze] gave rise to unreasonable inconsistencies in the administrative interpretations, or to actions plainly without the purpose and scope of the Order, then we will readily rectify them." 472 F.2d at 1069. We cannot say that the alleged disparity here represents an unreasonable inconsistency in the agency's administration of the Order. It is clear that the standard player contract was not limited to the regular football season.[8] Conversely, in addition to setting salaries for pre-season games, the collective agreement established minimum salaries for the regular season as well. The collective agreement contemplated, and indeed required, the signing of individual standard player contracts. The two agreements thus covered different aspects of a single period of employment. Under the OEP ruling, salary provisions contained in the player contracts escaped the freeze only if performance of this single employment service was begun prior to August 15. In sum, the continuing service required of a football player under these contracts is sufficiently different from the discrete services performed by the Falcons—i. e., performance of football games—to justify this result.

■ *Second:* The Falcons argue that *USC* erroneously focused on the provisions of the Executive Order which relate to ceiling price, and ignored the portion of the Order which describes the actual conduct to be prohibited. The language relied upon is contained in the third sentence of § 1(a) of the Order, quoted *supra* n. 7. In pertinent part, the third sentence provides that "[n]o person shall charge, assess, or receive * * * in any transaction prices * * * in any form

higher than those permitted hereunder * * *." Closely related to this contention is the argument that *USC* erred in according "great deference" to an agency interpretation which is in alleged conflict with the clear meaning of the quoted language. That meaning, the Falcons assert, is that prices which have been fully collected prior to August 15 are beyond the Order's reach.

We begin by emphasizing that there is textual support for the OEP's interpretation of the Order, the Falcons' contention to the contrary notwithstanding. The Order proscribes higher prices "in any transaction." For ceiling price purposes, the Order expressly looks to prices "pertaining to * * * actual transactions." It is not unreasonable to construe the third sentence of the Order to incorporate this same concept, *i. e.*, to proscribe higher prices which pertain to future transactions, even though payment may already have been conditionally received. Just as a service transaction may reasonably be said to "occur" at the time of performance, a price may be deemed to be "charged" as of that same date. *Cf.* CLC Release No. 4, *supra*, 38 Fed.Reg. 16651. This is particularly true when it is realized that under the Falcons' alternative interpretation, patrons who had purchased tickets well in advance of the freeze would pay higher prices to sit side by side with fans who bought tickets after August 15. Thus, even if we were to yield to the Falcons' insistence that we interpret the Order *de novo*, it is not at all clear that we would reach a result different from that of the OEP.

The point of *USC* was that such a *de novo* analysis by the courts is both unnecessary and improper. "In delegat-

---

8. Paragraph 1 of the contract provides that "[t]he term of this contract shall be from the date of execution hereof * * *." The OEP ruling was expressly limited to players "who have signed 1971 contracts." Paragraph 2 of the contract recites the player's agreement "during the term of this contract to report promptly for the Club's training sessions and, at the Club's direction, to ren-

der his full time services during such training sessions and to participate in all practice sessions and in all League and other football games scheduled for or by the Club." Further, Paragraph 3 expressly provides that the Club shall pay board, lodging and travel expenses for away-from-home training or games during the pre-season period.

ing to the agencies the duty to develop the very definitions of the words used in the Order, the broadest possible delegation of power was given." *USC* at 1068. The delegation by the 1970 Act itself was no less broad. Congress, in § 202(a), had said only that prices might not be reduced below the levels of May 25, 1970.[9] See *USC* at 1070. It is no abdication of our constitutional role for this court to recognize the breadth of the delegations involved in this particular statute and this particular Order. The Supreme Court has stated in the context of an earlier price control statute that "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).[10] As discussed above and as fully explained in *USC*, Circular No. 11 was not "plainly erroneous or inconsistent" with Executive Order 11615. Accordingly, we hold once again that such ticket price increases violated the Executive Order.

*2. Was the 1970 Act an unconstitutional delegation of legislative power?*

■ Relying upon A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the Falcons urge that the 1970 Act is void as representing an unconstitutional delegation of legislative power

to the President. It is conceded that subsequent to *Schechter,* no federal statute has been held unconstitutional by the Supreme Court on that basis. Among the statutes to survive a delegation challenge was the Emergency Price Control Act of 1942. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

In Amalgamated Meat Cutters & Butcher Workmen v. Connally, D.D.C., 337 F.Supp. 737 (1971), *supra,* a three-judge district court upheld the 1970 Act in the face of a delegation challenge. Several other district courts have reached the same result.[11] The exhaustive and learned opinion by Judge Leventhal in *Meat Cutters* has been favorably cited by this court on several occasions. See United States v. Lieb, *supra,* 462 F.2d at 1165; *USC, supra,* 472 F.2d at 1070; IBEW Local 11 v. Boldt, T.E.C.A., 481 F.2d 1392, 1395, cert. denied, 414 U.S. 1092, 94 S.Ct. 723, 38 L.Ed.2d 549 (1973). It appears, however, that this is the first occasion upon which our court has been called to directly decide the delegation question. This likely is due in part to the fact that the 1971 Amendments appear to have eliminated any doubt as to the Act's validity under Article I of the Constitution.

We are in substantial agreement with the reasoning of *Meat Cutters,* and concur in the result there reached. It would serve only to unduly prolong this opinion were we to further elaborate our views on this subject. Accordingly, on the authority of *Meat Cutters,* we hold that the Economic Stabilization Act of 1970,

9. " § 202. Presidential authority
(a) The President is authorized to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970. Such orders and regulations may provide for the making of such adjustments as may be necessary to prevent gross inequities."

10. The Falcons emphasize that the cited quotation is followed by this sentence: "The legality of the result reached by this process, of course, is quite a different matter." The "legality" referred to is the regulation's va-

lidity under the enabling statute and the Constitution. 325 U.S. at 414, 418–419, 65 S.Ct. at 1217. As noted above, the Act itself requires only that prices be stabilized at levels not below those of May 25, 1970. The *constitutional* validity of the Order as interpreted and applied is discussed elsewhere in this opinion.

11. See, *e. g.,* California Teachers Association v. Newport Mesa Unified School District, C.D.Calif., 333 F.Supp. 436, 446–447 (1971); United States v. Cincinnati Transit, Inc., S.D.Ohio, 337 F.Supp. 1068, 1072 (1972).

as it existed on August 15, 1971, was not an unconstitutional delegation of legislative power to the President.

### 3. Did Executive Order 11615 violate § 202(b) of the Economic Stabilization Act?

 As originally enacted on August 15, 1970, the Economic Stabilization Act did not restrict the President's authority to institute selective economic controls. Accordingly, on March 29, 1971, the President issued Executive Order 11588, 36 Fed.Reg. 6339, which provided for the stabilization of wages and prices in a single industry (the construction industry). Less than two months later, Congress amended § 202 of the 1970 Act to add the following provision:

> "(b) The authority conferred on the President by this section shall not be exercised with respect to a particular industry or segment of the economy unless the President determines, after taking into account the seasonal nature of employment, the rate of employment or underemployment, and other mitigating factors, that prices or wages in that industry or segment of the economy have increased at a rate which is grossly disproportionate to the rate at which prices or wages have increased in the economy generally." Pub.L. 92-15, 85 Stat. 38 (May 18, 1971).

This provision remained in effect until the enactment of the 1971 Amendments on December 22, 1971. No comparable provision was retained in the amended Act.

The Falcons argue that Executive Order 11615 violated § 202(b) because (1) the Order affected "a particular industry or segment of the economy" only, and (2) no prior determination was made by the President that prices or wages in the affected segment increased at a rate which was grossly dis-

proportionate to the rate at which prices or wages increased in the economy generally. The parties stipulated that the following segments of the economy were not subject to regulation under the Order: (1) raw agricultural products, (2) exports, (3) interest rates, (4) corporate stocks and bonds and municipal bonds, and (5) corporate dividends. On brief, the Falcons assert that the excluded segments represent business receipts during 1971 of 555 billion dollars, or approximately 20 per cent of total business receipts in the United States. The parties have further stipulated that at the time of the issuance of Executive Order 11615, the President did not determine that prices and wages affected by the Order had increased at a grossly disproportionate rate when compared with the economy generally.

We initially note that of the five listed exempt categories, only raw agricultural products were expressly excluded by the Order. Prices of exports and stocks and bonds were first exempted by OEP Regulation No. 1, pursuant to the agency's authority under § 4(a) of the Order to grant exemptions. 36 Fed.Reg. at 16515. Interest rates and corporate dividends were not subject to the freeze because they were not "prices, rents, wages, or salaries" within the meaning of the Act and the Order. See OEP Circular Nos. 1 and 3, 36 Fed.Reg. 16587 and 17345 (1971); and see Conf.Rep.No. 91-1386, 91st Cong., 2d Sess., p. 7 (1970).[12] Since § 202(b) refers only to the rate at which "prices or wages" have increased in the economy generally, the relevance of economic data pertaining to dividends and interest is questionable.

In any event, in light of both the language of § 202(b) and the legislative purpose behind its enactment, the Falcons' contention is without merit. Even if 80 per cent of the economy may be literally regarded as a "segment" of the entire economy, it surely is not a "particular * * * segment" within

---

12. Interest and dividends subsequently were brought within the Act's coverage by §§ 202 and 203(a)(2) of the 1971 Amendments.

the meaning of § 202(b). It would be anomalous to require a finding that wages and prices comprising 80 per cent of the economy had increased at a rate "grossly disproportionate" to such increases in the "economy generally." Finally, the Report of the Senate Committee on Banking, Housing and Urban Affairs relative to § 202(b) confirms that the finding requirement was directed only at the imposition of controls over relatively small segments of the economy:

> "The committee has serious reservations about applying the price and wage control authority *to a single industry*. An industry subject to price controls has no control over the price it must pay for the products of other industries. Likewise, workers subject to wage controls have no protection against a continued rise in the cost of living. * * *

> "As a restriction on using the wage-price control authority *on a single industry,* the committee approved an amendment requiring a specific finding by the President. Under the amendment, the President is prohibited from using the authority *in a single industry* unless he determines that wages or prices in that industry have increased at a rate which is grossly disproportionate to the rate for the economy as a whole, after taking into account any mitigating factors such as the seasonal nature of employment or the rate of unemployment or under employment in the particular industry." S.Rep.No. 92–89, 92d Cong., 1st Sess., 1 U.S.Code Cong. & Admin.News 1971, pp. 1048–1049 (emphasis added).

Since § 202(b) does not apply to the controls instituted by Executive Order 11615, the President's action need only fall within the general authority conferred by § 202(a), *supra.* Such section clearly authorized the imposition of controls over something less than the entire economy.

*4. Did Executive Order 11615 and the regulations thereunder violate the Administrative Procedure Act?*

The Falcons contend that Executive Order 11615, CLC Order No. 1, and OEP Regulation No. 1 were issued without observance of procedures required by § 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553. In pertinent part, § 553 provides as follows:

> "(b) General notice of proposed rule making shall be published in the Federal Register * * *.

Except when notice or hearing is required by statute, this subsection does not apply—

> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

> (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making * * *.

> (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date * * *."

No general notice of proposed rule making preceded the issuance of any of the orders or regulations here challenged. Further, neither Executive Order 11615 nor CLC Order No. 1 contained an express finding, accompanied by reasons, that "notice and public procedure * * * are impracticable, unnecessary, or contrary to the public interest." OEP Regulation No. 1 did contain such a finding, but only by virtue of an amendment to the Regulation dated November 12, 1971, *i. e.,* one day before Phase I was to expire.

Since each of the three challenged actions raise somewhat different problems, we shall treat them separately.

### a. Executive Order 11615

■ The first question raised by the Executive Order is whether the President is an "agency" within the meaning of the APA. The case for subjecting the President to the provisions of the APA is a strong one.[13] Courts have shown some reluctance to decide the question, however, in view of potential ramifications under the Freedom of Information Act,[14] see Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1073 (1971), and the judicial review provisions of the APA,[15] see Senate Select Committee on Presidential Campaign Activities v. Nixon, D.D.C., 366 F.Supp. 51, 58 (1973). Upon this certification the Government has not made known its position with regard to this important question. We shall therefore assume, *arguendo*, that the President is an agency within the meaning of the APA.

The issue thus becomes whether we must set aside the Order for failure to conform with the procedural requirements of 5 U.S.C. § 553. In *Meat Cutters, supra*, these requirements were recognized but were deemed to be of little practical consequence in view of the exception provided by § 553(b)(B), *supra*. 337 F.Supp. at 761. The problem here cannot be so easily dismissed since the Government has stipulated that the finding required to invoke the exception was not made.

At the outset, we are satisfied that there was in fact "good cause" to find that advance notice of the freeze was "impracticable, unnecessary, or contrary to the public interest" within the meaning of § 553(b)(B). This conclusion is based upon facts so obvious that they may be judicially noticed. Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct "actual transactions"—or avoid them—before the freeze deadline. Each price increase would have generated further increases in a growing spiral of inflation. We note in this connection the remarks of George P. Schultz, Director of the Office of Management and Budget, made during the course of an August 15, 1971 press conference, immediately prior to the President's announcement of the freeze:

> " * * * It is very difficult for the people in the administration to talk publicly about something like a wage-price freeze or something of that kind because immediately people raise their prices. In fact, I would say—and I don't have any really strong evidence to this effect—but I would say that the very large increase in the industrial component of the wholesale price index in July that was reported a week or so ago probably reflects a reaction to all of the talk, with people putting their list prices up. * * * " [16]

While the legislative history of the 1970 Act does not reveal consideration of the problem discussed by Director

---

13. 5 U.S.C. § 551 defines "agency," for purposes of §§ 551–559, to mean "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—(A) the Congress; (B) the courts of the United States; * * *." "The President" is not in terms excluded. In view of the glaring exclusion of two of the three principal branches of the Government, an intention not to exempt the President may be readily inferred. *Cf.* the Federal Register Act, 44 U.S.C. § 1501 et seq., in which "agency" is defined by listing included offices, and where "the President" is included

and "the legislative or judicial branches of the Government" are excluded. In *Meat Cutters, supra*, Judge Leventhal without deciding the question cited three leading scholars for the proposition that "the term 'agency' in the APA includes the President." 337 F.Supp. at 761.

14. 5 U.S.C. § 552.

15. 5 U.S.C. §§ 701–706. As is here relevant, the definition of "agency" contained in § 701 is identical to that in § 551.

16. CCH Economic Controls ¶ 8367, p. 8406 (1972).

Schultz,[17] it is clear that Congress anticipated the need for abrupt action in dealing with inflation. The Report of the House Committee on Banking and Currency repeatedly refers to the President's power under the Act as "standby authority." H.R.Rep.No.91–1330, 91st Cong., 2d Sess., pp. 9, 11, 20 (1970). It would appear that a major factor in the decision of Congress to delegate such authority was its belief that only the Executive could properly react to day-to-day changes in the economy.[18] The psychological value of a "dramatic" initiation of controls appears also to have been contemplated. *Meat Cutters, supra,* p. 752. And although not phrased in terms of a finding for purposes of § 553(b)(B), *supra,* the preamble to the Order itself refers to another ground for urgency: "Whereas, the present balance of payments situation makes it especially urgent to stabilize prices, rents, wages, and salaries * * *."

The Falcons argue that because (1) the Government has stipulated that no finding was made, and (2) no finding and statement of reasons was incorporated in the Executive Order, the Order should now be set aside. We cannot agree that Congress intended to visit such consequence upon a technical violation of § 553(b) where the reasons for exempting the President's action from the notice requirement are so obvious and compelling. *Cf.* Appalachian Power Co. v. Environmental Protection Agency, 4 Cir., 477 F.2d 495, 502–503 (1973); Duquesne Light Co. v. Environmental Protection Agency, 3 Cir., 481 F.2d 1, 8 (1973). A failure to incorporate in rules a statement of basis and purpose,

in technical violation of § 553(c), has been held not to void the rules where "[b]oth the basis and purpose are obvious from the specific governing legislation and the entire trade was fairly apprised of them by the procedure followed." Hoving Corp. v. Federal Trade Commission, 2 Cir., 290 F.2d 803, 807 (1961). In both cases upon which the Falcons principally rely,[19] the inquiry was quite properly directed at whether the agency in fact had good cause to bypass the notice requirement. We hold that Executive Order 11615 did not violate § 4 of the Administrative Procedure Act.

### b. CLC Order No. 1

On August 17, 1971, the CLC issued its Order No. 1 under the title, "Delegation of Authority." 36 Fed.Reg. 16215. The Order consisted of five brief paragraphs. The first and second paragraphs delegated the CLC's authority under §§ 1, 4(a), 5 and 7 of Executive Order 11615 to the Director of the OEP. Paragraph 3 of Order No. 1 directed executive departments and agencies to assist the Director pursuant to 31 U.S.C. § 691; paragraph 4 required consultation with the CLC on significant policy decisions; and paragraph 5 permitted the Director to redelegate the authority thereby conferred.

Section 553(b)(A) excepts, *inter alia,* "rules of agency organization, procedure, or practice" from the notice requirement of § 553. Nothing contained in CLC Order No. 1 goes beyond the matters thus excluded. Accordingly, Order No. 1 did not violate the APA.

---

17. The House Committee on Banking and Currency subsequently did acknowledge this reason for secrecy in connection with Phase I, however. See H.R.Rep.No.92–714, 92d Cong., 1st Sess., p. 4 (1971).

18. In response to criticism that the freeze should be instituted by Congress directly, and not by the President, the Committee Report states: "[A wage-price freeze] is not a legislative function, both in terms of appropriate timing in instituting the controls and removing them, since only the Executive

can determine the appropriate time for instituting the controls and removing them * * *." Further: "if the Congress had mandated such action through to the termination date [of the Act], it would well be days or weeks before such action would be rescinded by the Congress if needed * * *." H.R.Rep.No.91–1330, *supra,* p. 11.

19. Texaco, Inc. v. Federal Power Commission, 3 Cir., 412 F.2d 740 (1969); Kelly v. Dept. of Interior, E.D.Calif., 339 F.Supp. 1095 (1972).

### c. OEP Regulation No. 1

█ The bulk of OEP Regulation No. 1 merely rephrases and interprets the Executive Order. Indeed, section 1 of the Regulation states that the Regulation's purpose is to "promulgate initial guidance and procedures" for implementing the freeze. To the extent that the Regulation is thus an "interpretative rule," it falls within the exception to § 553 provided by § 553(b)(A). To the extent that it arguably may prescribe non-exempt rules (none of which would appear to affect the Falcons in this case), the considerations previously set forth with respect to the Executive Order apply with equal force to the Regulation. We thus need not decide whether the amendment to the Regulation dated November 12, 1971, which was nothing more than a *pro forma* statement of the obvious,[20] could retroactively cure a technical flaw in the rule.

5. *Additional constitutional questions: Does Executive Order 11615 as applied represent an ex post facto law or bill of attainder, a taking of property without just compensation, or a denial of due process of law?*

█ The Falcons finally advance a variety of constitutional arguments relating to the allegedly retroactive nature of the Executive Order as here applied. Similar arguments on previous occasions have been uniformly rejected by our court. See *USC, supra,* p. 1070; *IBEW Local 11 v. Boldt, supra,* p. 1395 (just compensation); *Western States Meat Packers Association, Inc. v. Dunlop, T.E.C.A.,* 482 F.2d 1401, 1403–1404 (1973) (just compensation); see also, *Meat Cutters, supra,* pp. 763–764 (due process); *Taylor v. Brown,* Emer.Ct. App., 137 F.2d 654, 659–660, cert. denied, 320 U.S. 787, 64 S.Ct. 194, 88 L.Ed 473

(1943) (*ex post facto,* just compensation).

The Falcons argue from the assumption that their rights in the season ticket sale proceeds were "vested" and "unqualified" as of August 15, 1971. Such assumption is faulty inasmuch as the Falcons concede, elsewhere in their brief, that if the games had not been performed they would have been liable for the purchase price. See, *e. g., De La Ysla v. Publix Theatres Corp.,* 82 Utah 598, 26 P.2d 818 (1933). The authorities cited by the Falcons do not so much indicate that a ticket is not a contract, as hold that the seller's duty and the remedies for breach thereof are limited. A ticket does not create an irrevocable right of entry, *Marrone v. Washington Jockey Club,* 227 U.S. 633, 33 S.Ct. 401 57 L.Ed. 679 (1913), nor does it warrant against personal injuries, *Jordan v. Concho Theatres, Inc.,* 160 S.W.2d 275 (Tex. Civ.App.1941). We are cited to no case, however, which indicates that the Falcons could refuse to perform the scheduled games with impunity on the ground that their prior rights were "unqualified."[21]

It is well settled that Congress may interfere with private contractual obligations where such interference is a necessary incident of otherwise valid legislation. *Norman v. Baltimore & Ohio R. Co.,* 294 U.S. 240, 307–311, 55 S.Ct. 407, 79 L.Ed. 885 (1935); *Louisville & Nashville R. Co. v. Mottley,* 219 U.S. 467, 480–483, 31 S.Ct. 265, 55 L.Ed. 297 (1911); *USC, supra,* p. 1070. That one of the contracting parties may have completely performed his obligations does not remove this "congenital infirmity" (*Norman, supra,* 294 U.S. at 308, 55 S.Ct. 407) which is a part of every contract subject to Congressional power. *Louisville & Nashville R. Co. v. Mottley, supra.*

---

20. "Because of the need for prompt determinations, notice of proposed rule making and public procedure thereon have been found to be impracticable and contrary to the public interest." 36 Fed.Reg. 21761 (1971).

21. Contrast *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), holding that a statute which deprived mortgagees of substantial existing rights in specific mortgaged property violated the Fifth Amendment.

As for the *ex post facto* clause, the Order cannot be said to *punish* the Falcons for prior conduct within the meaning of such cases as Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1809), and Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867). See also, Calder v. Bull, 3 U.S. (3 Dall.) 386, 390–391, 1 L.Ed. 648 (1798). Neither is the Order a bill of attainder, see United States v. Brown, 381 U.S. 437, 447, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). It is true that § 204 of the 1970 Act prescribes fines for willful violations. However, the Government has sought only an injunction and restitution under § 205, for which there is no requirement of willfulness, and none of the letters or telegrams referred to in the Falcons' complaint threaten criminal action or accuse the Falcons of willful wrongdoing. In Manning v. University of Notre Dame Du Lac, T.E.C.A., 484 F.2d 501, 503–504 (1973), on nearly identical facts, we indicated that the violation likely was not willful within the meaning of § 208(a) of the amended Act (the successor to § 204). In any event, any fine which might be imposed would be based upon willful conduct which occurred after the effective date of the Order.

## II

No. 5–6 arises out of plaintiff Burt DeRieux's purchase of four Atlanta Falcons season tickets in June 1971. On August 27, 1971, DeRieux by letter demanded the return of $1.50 per ticket per game; the demand was rejected by the Falcons on September 2. Thereafter, on September 10, De-Rieux filed the present class action on behalf of all Falcons season ticket holders. DeRieux's action preceded by seventeen days the Government's suit for injunction and restitution (No. 5–8).[22]

Both the original and first amended complaints alleged that the action arose under the Economic Stabilization Act of 1970, and invoked federal jurisdiction under 28 U.S.C. § 1331.[23] The complaints recognized, however, that the plaintiff sought relief "not provided for in the Economic Stabilization Act, Executive Order 11615, or in any other administrative forum, and which only this Court can grant." By amendment to the complaint, filed July 23, 1973, De-Rieux alleged for the first time that his claim was based upon § 210 of the amended Act.[24]

The amendment further alleged that the Falcons "have and continue to will-

22. DeRieux alleges that the Government instituted its enforcement action only as a result of his persistent protests, which included the August 27 letter to the Falcons, a complaint with the Internal Revenue Service dated September 9 and, shortly thereafter, the present lawsuit.

23. Apparently recognizing the jurisdictional problem posed by Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), and Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), DeRieux now additionally claims that jurisdiction is conferred by 28 U.S.C. § 1337, under which there is no requirement of a $10,000 minimum amount in controversy.

24. "§ 210. Suits for damages or other relief
 (a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.
 (b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plaintiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:
 (1) an amount not more than three times the amount of the overcharge upon which the action is based, or
 (2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge: Provided, That where the overcharge is not willful within the meaning of section 208(a) of this title, no action for an overcharge may be brought

fully refuse to refund the amount due * * * despite the decision of the Temporary Emergency Court of Appeals in [USC]." Finally, the amendment sought treble damages in the amount of $1,140,000.00, attorneys fees and costs pursuant to § 210(b) of the amended Act.

The principal question now presented is whether either the 1970 Act or § 210 of the amended Act create a private right of action for Phase I violations which occurred prior to December 22, 1971, the date on which § 210 was enacted.

In terms the 1970 Act, in § 205, provided only for injunctive relief in actions brought by an agency of the United States:

"Whenever it appears to any agency of the United States, authorized by the President to exercise the authority contained in this section * * * that any person has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any regulation or order under this title, it may in its discretion bring an action * * * to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. Upon application of the agency, any such court may also issue mandatory injunctions commanding any person to comply with any regulation or order under this title."

Section 7(b) of the Executive Order conferred upon the CLC the authority "in its discretion" to request the Department of Justice to bring actions for injunctions under § 205.

Faced with the absence of any express authority for a private right of action under the 1970 Act, DeRieux argues that such a right may be implied from the purposes and policies of the Act.

See Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). More specifically, the argument is that "the class's claim is within the scope of the very rights which the statute and the Executive Order were attempting to protect." The purpose of the Act, DeRieux argues, was "to protect consumers from an increase in prices."

The question of implied private rights of action was most recently the subject of Supreme Court review in National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). There, the Court undertook to construe § 307(a) of the "Amtrak Act," 45 U.S.C. § 547(a). Section 307(a) authorized enforcement actions by the Attorney General and, in cases involving a labor agreement, by affected employees or their representatives. After examining legislative history and the policies of the Act, the Court concluded that § 307(a) provided the exclusive remedies for violations and that no additional private right of action could properly be inferred.

In some respects, the problem in *Railroad Passengers* was different than that posed by § 205 of the Economic Stabilization Act. Since the Amtrak Act expressly authorized some private actions (by employees under a labor agreement), the maxim *expressio unius est exclusio alterius* applied with particular force to other private actions not so authorized. In addition, in drafting the final Amtrak bill Congress had considered and rejected a proposal to permit suits by any "aggrieved person." Our review of the legislative history of the Economic Stabilization Act of 1970 has failed to reveal any specific consideration of pro-

---

by or on behalf of any person unless such person has first presented to the seller or renter a bona fide claim for refund of the overcharge and has not received repayment of such overcharge within ninety days from the date of the presentation of such claim.

(c) For the purposes of this section, the term 'overcharge' means the amount by which the consideration for the rental of property or the sale of goods or services exceeds the applicable ceiling under regulations or orders issued under this title."

posals to create or limit private rights of action.[25]

We are not left totally without guidance, however. In interpreting the 1970 Act, the provisions of prior economic controls legislation are significant. *Meat Cutters, supra,* p. 748. Both the Emergency Price Control Act of 1942 and the Defense Production Act of 1950 provided for private damage actions in addition to Government suits for injunctions and fines. 56 Stat. 23, 34; 64 Stat. 798, 811. The similarity in language between § 205 and the injunction provisions of the two earlier statutes indicates that § 205 was derived from those provisions; this is confirmed by the legislative history.[26] From this background of prior law, Congress surely was aware of the possibility of private enforcement, and its failure to expressly provide for private actions in the 1970 Act can only be regarded as intentional.

Further, an examination of the purpose of the 1970 Act supports the conclusion that the remedies contained in § 205 were intended to be exclusive. Congress anticipated that the President would implement the Act by imposing a short term freeze of only two or three months' duration. H.R.Rep.No.91–1330, *supra,* p. 9. The purpose of the anticipated freeze was to break the nation's "inflationary psychology" and to provide a breathing period during which longer term controls could be formulated. See *Meat Cutters, supra,* pp. 747–748, 751–752; Hearings on H.R. 17880, *supra* n. 25, pp. 6, 11–12. It is entirely rea-

sonable that Congress would choose not to confer individual rights of action with respect to controls of such short duration and uncertain consequence.

The difference between the Economic Stabilization Act of 1970 and statutes under which an implied private right of action has been recognized is apparent. Unlike the Voting Rights Act of 1965,[27] the Securities Exchange Act of 1934,[28] or the Federal Safety Appliance Acts,[29] the Economic Stabilization Act was not designed to protect or confer "private rights" within the usual meaning of that phrase. Indeed, as the present case well illustrates, the effect of the Act and Order in many instances was destructive of private contract rights. Rather, the Act prescribed emergency medicine to remedy an affliction affecting the entire national economy. Individuals were ultimately sought to be benefitted, but as a consequence of overall economic stabilization. There was no intention to benefit a specific class. *Cf.* Daly v. Columbia Broadcasting System, Inc., 7 Cir., 309 F.2d 83 (1962). Even when Congress amended the Act to provide for individual actions, in § 210, its principal concern was deterrence and effective enforcement, and not the vindication of individual "rights" as such. See H.R.Rep.No.92–714, 92d Cong., 1st Sess., pp. 8, 28 (1971). We conclude that a private right of action cannot be inferred from the 1970 Act.[30]

DeRieux next argues that even if no implied right of action was created by the 1970 Act, the December 22, 1971

25. The adequacy of the Act's enforcement provisions were challenged, however, both in hearings and on the floor of the House. See Hearings on H.R. 17880 before the House Committee on Banking and Currency, 91st Cong., 2d Sess., pp. 83–84; 116 Cong.Rec. 26837 (1970) (remarks of Representative Anderson).

26. Remarks of Representative Reuss, Hearings on H.R. 17880, *supra* n. 25, pp. 5–6 (1970): "The language of title II is derived from the battle-tested language of the Emergency Price Control Act of 1942."

27. See Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

28. See J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

29. See Texas & Pacific Ry. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916).

30. Accord, ICA Southeast, Inc. v. Optimum Systems, Inc., E.D.La., CCH Economic Controls ¶ 9999A(1), p. 9991 (1971). *Cf.* Heavy Contractors Association, Inc. v. Operating Engineers Local 571, D.Neb., 328 F.Supp. 897 (1971); and see Acorn Iron & Supply Co. v. Bethlehem Steel Co., E.D.Pa., 96 F.Supp. 481 (1951).

amendments to the Act supplied the previously missing remedy. The question is whether § 210 of the amended Act, supra n. 24, may be read to have retrospective effect.

If § 210 were solely concerned with perfecting a remedy for previous violations of the law, it might well permit the construction here urged. See Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); Koger v. Ball, 4 Cir., 497 F.2d 702 (1974). But the 1971 Amendments did more than merely make recovery more convenient or more certain. Section 210(b) provides for the awarding of a sum equal to the greater of (1) three times the amount of the overcharge, or (2) not less than $100 nor more than $1,000. Thus, the damages available under § 210(b) are punitive in nature and substantially larger than those previously recoverable in Government actions for restitution. The amendment to the complaint here invokes these very provisions in seeking treble damages in excess of $1,100,000.

For this reason, we believe that § 210 represents an exception to the general rule regarding retrospective application in pending cases of changes in the law. That rule, as recently articulated by the Supreme Court in Bradley v. Richmond School Board, *supra*, is that "even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." 416 U.S. at 715, [94 S.Ct. at 2018]. The *Bradley* Court was nevertheless careful to state that courts need not always apply intervening law in the absence of clear legislative direction to

the contrary. Rather, exceptions should be drawn where application of the intervening statute would result in manifest injustice. The Court further indicated that the question of retrospective application was to be determined in each case by analysis of "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Id.* at 717, 94 S.Ct. at 2019.

Here, the decisive factor is the impact of § 210 upon the Falcons' rights. Unlike the *Bradley* situation, where the intervening statute merely provided for an award of attorneys fees to which plaintiffs arguably already were entitled, the application of § 210 would impose "an additional [and] unforeseeable obligation" in the form of potential treble damages. *Id.* at 721, 94 S.Ct. at 2021. Even though such an award is discretionary with the district court, its prospect alone might have caused the Falcons to order their conduct differently so as to avoid the risk. *Id.* at 721, 94 S.Ct. 2006. In light of the new obligation imposed, § 210 should not be construed to act retrospectively.[31]

This conclusion is fortified by the deterrent purpose of § 210, above referred to. Only future conduct can be deterred. Further, where Congress desired that the 1971 Amendments apply to pending cases (or, by analogy, to previous violations), it did not lack for words to make such purpose clear. Compare § 210(a), *supra* n. 24, with § 211(a) and (h).[32] We do not read *Bradley* to hold that evidence of legislative intent short of express statutory language is irrelevant to the retroactivity question, and we believe these factors are significant.

31. Accord, Piaskoski v. Associated Hospital Service, Inc., E.D.Wis., 347 F.Supp. 470 (1972). See also, United States v. St. Regis Paper Co., S.D.N.Y., 106 F.Supp. 286, 291 (1952) (amended regulation under Defense Production Act).

32. "§ 211. Judicial review.
 (a) The district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title,

or under regulations or orders issued thereunder * * *.

 * * * * *

 (h) The provisions of this section apply to any actions or suits pending in any court, Federal or State, on the date of enactment of this section in which no final order or judgment has been rendered. Any affected party seeking relief shall be required to follow the procedures of this title."

DeRieux finally argues that § 210 applies prospectively to the Falcons' continuing refusal to refund the overcharges. Such contention was squarely rejected in Manning v. University of Notre Dame Du Lac, *supra,* where we held that the "overcharge" occurred, at the latest, at the time the football games were played. The argument that the "legal wrong" language of § 210(a) provides a separate basis for relief was also there rejected. 484 F.2d at 504.

It is true that *Manning* applied the provisions of § 210 in a class action based upon a Phase I violation. *Manning* did not recognize or treat the threshold retroactivity issue, however, and is therefore in no way contrary to our disposition of this case. See Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925).

## DISPOSITION

Pursuant to the authority granted by § 211(c) and (h) of the Economic Stabilization Act of 1970, as amended, this court now makes the following disposition of these consolidated cases:

The complaint in No. 5–6 fails to state a claim upon which relief may be granted. Accordingly, No. 5–6 is remanded to the district court with directions to dismiss the complaint.

In No. 5–7, defendants are entitled to judgment as a matter of law. No. 5–7 is therefore remanded to the district court with directions to enter judgment in accordance with this opinion in favor of defendants.

In No. 5–8, the United States is entitled to judgment as a matter of law. Accordingly, No. 5–8 is remanded to the district court with directions to enter judgment in accordance with this opinion in favor of plaintiff. The district court is further directed to determine and carry out such remedies as it may deem appropriate, including the amount and manner in which restitution should be made. See University of Southern

California v. Cost of Living Council, *supra,* 472 F.2d at 1070; Murphy v. O'Brien, *supra,* 485 F.2d at 676; compare Manning v. University of Notre Dame Du Lac, *supra.*

Remanded with directions.