**UNITED STATES of America, Plaintiff-Appellant,**

v.

**PRO FOOTBALL, INC., d/b/a the Washington Redskins, Defendant-Appellee.**

No. DC–30.

Temporary Emergency Court of Appeals.

April 15, 1975.

Susan N. Wachtel, Atty., Dept. of Justice, Washington, D. C., Carla A. Hills, Asst. Atty. Gen., New York City and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., on the brief for appellant.

Harold Ungar, Williams, Connolly & Califano, and King & Nordlinger, Washington, D. C., on the brief for appellee.

Before ANDERSON, VAN OOSTERHOUT and HASTINGS, Judges.

HASTINGS, Judge:

This is an action by the United States against Pro Football, Inc. (the Redskins) which operates the Washington Redskins professional football team. In its complaint the government alleged that the Redskins had violated the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note (Supp. III, 1974) (the Act, Executive Order 11723 (3A C.F.R. 184 (1973 Comp.)), and the regulations pursuant thereto, in charging ticket prices for two 1973 preseason games which exceeded the freeze base price. The government sought restitution by refunding overcharges to ticket purchasers, a civil penalty of $2,500 for each of the two games, and the costs of the litigation.

Following the Redskins' answer and motions by both parties for summary judgment, the District Court for the District of Columbia, *sua sponte*, pursuant to § 211(c) of the Act, certified to the Temporary Emergency Court of Appeals as a substantial constitutional question the issue of whether application of Executive Order 11723 to the Redskins constituted "an ex post facto law, bill of attainder, a taking of property without just compensation, or a denial of due process of law." Our court granted the government's motion to have the entire case, both constitutional and non-constitutional issues, presented to us for final disposition. These, then, are the issues to be considered here:

(1) Whether the playing of football games at ticket prices higher than those charged in the 1972 season was a violation of the Economic Stabilization Act and Executive Order 11723;

(2) Whether it would be unconstitutional as an ex post facto law, bill of attainder, taking of property without

just compensation or a violation of the due process clause to apply Executive Order 11723 to the Redskins;

(3) Whether restitution should be ordered against the Redskins; and

(4) Whether civil penalties should be assessed against the Redskins.

## ECONOMIC STABILIZATION PROGRAM

In order to understand the significance of the particular circumstances from which this case arose it is necessary first to briefly review the history of the economic stabilization program and its effect upon ticket prices for sporting events.

Section 203 of the Economic Stabilization Act authorizes the President to issue orders and regulations to "stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970." On August 15, 1971, the President exercised that authority in Executive Order 11615, 36 Fed.Reg. 15727 (1971), to impose a ninety-day freeze on prices, rents, wages and salaries (Phase I). Section 1 of the Order stabilized prices at levels not greater than those pertaining to transactions during a thirty-day period ending August 14, 1971. If no transactions occurred in that period then the ceiling would be established by the nearest preceding thirty-day period in which there were transactions. Section 1 of the Order further provided:

No person shall charge, assess, or receive, directly or indirectly in any transaction prices or rents in any form higher than those permitted hereunder, and no person shall, directly or indirectly, pay or agree to pay in any transaction wages or salaries in any form, or to use any means to obtain payment of wages and salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise.

The Order established a Cost of Living Council (COLC) to which was delegated most of the President's authority under the Act. The Council was empowered to prescribe definitions for any terms used in the order, to make exceptions or grant exemptions, issue regulations and orders and to redelegate its authority to other federal agencies.

Under authority delegated by the COLC, the Director of the Office of Emergency Preparedness (OEP) issued circulars for general information. In order to explain the meaning of transaction as used in Executive Order 11615, OEP issued the following statement:

A transaction takes place when the seller ships the product to the buyer, not when the order is received. In the case of a service, the transaction takes place when the service is performed. Economic Stabilization Circular No. 101 § 302(1), 32A C.F.R. 40 (1974).

The OEP further provided:

The freeze applies to prices of advance sale tickets for sporting events occurring during the freeze. Economic Stabilization Circular No. 102 § 403(2), 32A C.F.R. 61 (1974).

Interpreting these Phase I guidelines, our court upheld the application of the rules to limit football ticket prices to those of the previous season where tickets were sold prior to the freeze for games to be played during the freeze. DeRieux v. Five Smiths, Inc., T.E.C.A., 499 F.2d 1321, cert. denied, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974) (hereinafter *Five Smiths*); University of Southern California v. Cost of Living Council, T.E.C.A., 472 F.2d 1065 (1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973) (hereinafter *USC*).

Phase II commenced November 13, 1971, and continued through January 12, 1973. The Price Commission was established to perform functions delegated to it by the COLC to stabilize rents and prices during this period of mandatory economic controls. During Phase II and continuing through Phase III the term "transaction" was redefined as occurring "at the time . . . a binding contract is entered into between the parties," rather than at the time of delivery of the services. Price Commission Regu-

lations § 300.5, 6.C.F.R. 210 (1973). In a Phase II ruling on the question of advance sale of tickets the Price Commission held:

. . . [T]he transaction occurs at the time the tickets are sold, because the team is bound to supply the tickets to the given event and there has been consideration. . . . This definition of transaction is different from the definition of transaction in effect during the freeze which looked to the time goods were shipped or services were performed. . . . Price Commission Ruling 1972–73, 6 C.F.R. 349–350 (1973).

On January 12, 1973, by Executive Order 11695, 38 Fed.Reg. 1473 (1973), the Phase III period of voluntary controls began. The Order abolished the Price Commission but continued the COLC which assumed the functions formerly performed by the Price Commission.

On June 15, 1973, the President issued Executive Order 11723, which froze prices for sixty days. Section 1 of the Order provided:

Section 1. Effective 9:00 p. m., e. s. t., June 13, 1973, no seller may charge to any class of purchaser and no purchaser may pay a price for any commodity or service which exceeds the freeze price charged for the same or a similar commodity or service in transactions with the same class of purchaser during the freeze base period. This order shall be effective for a maximum period of 60 days from the date hereof, until 11:59 p. m., e. s. t., August 12, 1973. It is not unlawful to charge or pay a price less than the freeze price and lower prices are encouraged.

Section 8 of the Order defined the "freeze base period" as the period from June 1 to June 8, 1973 or, for a seller who had no transactions during that period, the nearest preceding seven-day period in which he had a transaction. Section 8 further stated:

"Transaction" means an arms length sale between unrelated persons and is considered to occur at the time of shipment in the case of commodities and the time of performance in the case of services.

In order to clarify the application of Executive Order 11723 to the sale of tickets made in advance of the freeze for sporting events or other entertainment occurring during the freeze the COLC issued "Freeze Group Question and Answers No. 4," 38 Fed.Reg. 16651 (1973), which included this response:

Admission prices for events occurring during the freeze period may be no higher than charges made for the same type of event which took place during the freeze base period. The price for advance tickets is deemed to be charged at the time of the performance of the entertainment or sporting event. If the ticket sales prior to the freeze were higher than the prices charged in a substantial number of transactions for the same type of event during the freeze base period, then reimbursement must be made in the amount a purchase was charged above the freeze price.[1]

Thus, the price freezes of 1971 and 1973 were designed to have the same effect on tickets to sporting events held during the freeze periods. The transaction was considered to occur, or the price was deemed to be charged, at the time of the playing of the game and it was as of that time that compliance with the freeze order was to be judged.

The question presented by this case is whether the particular circumstances under which the Redskins acted should serve to relieve them from the general application of this regulatory scheme.

---

1. This release had the effect of giving the language of Executive Order 11723, to "charge . . . a price," a meaning identical to the 1971 freeze language, to "charge . . . in any transaction prices."

## THE FACTS

The following facts were stipulated by the parties. In December 1972 the Price Commission authorized the Redskins, under Phase II of the price control program then in effect, to increase its ticket prices for the 1973 season by an average of $2.00 per ticket over 1972 prices in order to defray increased costs which the Commission found would be incurred in 1973. The Commission's authorization was based on adequate disclosure by the Redskins of all relevant facts and was consistent with existing law.

On March 12, 1973, the Redskins increased ticket prices for games scheduled in 1973 by an average of $1.90 per ticket over 1972 prices. The specific price increases were as follows:

| Number of Seats | 1972 Price | 1973 Price |
|---|---|---|
| 1,779 | $12.00 | $15.00 |
| 7,933 | 8.00 | 10.00 |
| 38,588 | 7.00 | 9.00 |
| 4,894 | 7.00 | 8.00 |

By the time these increases were made effective, the mandatory controls of Phase II had been replaced by the voluntary controls of Phase III.

By June 13, 1973, the beginning of the 1973 freeze period, the Redskins had sold most of the tickets for all of its scheduled 1973 home games except for the August 10 game with Denver. The Denver game had recently been rescheduled to be played in Washington, and only about twenty-five percent of the tickets for that game had been sold. Prior to the freeze the Redskins had substantially either expended or committed themselves to expend in their 1973 operations all of the proceeds of the increased ticket prices. The nature of the Redskins' business is such that the cost of each season's operations is substantially financed through the receipts in that same season.

During the period from June 13 to August 12, 1973, when the freeze was in effect, the Redskins played two home games, one on August 3 against Detroit and one on August 10 against Denver.

For both of these games the Redskins charged the increased ticket prices set forth above. The amount of the increase for the two games was $180,-384.00.

Shortly before the playing of the August 3 game, the Redskins were advised that the Department of Justice felt that the ticket price increases for that game and the one to be played on August 10 were illegal because they exceeded those charged for the last game in 1972. The Redskins were further advised to inform purchasers at both games by public address announcements to retain their ticket stubs for possible refunds of excess prices. The Redskins agreed to make the announcements and did so at both games.

After the filing of this suit, the Redskins obtained the agreement of the Department of Justice to extend the time to answer in order to permit the Redskins to seek a determination by the COLC of the legality of the price increase. The Redskins' request for exemption from the "transaction" definition of the 1973 freeze by the COLC was denied, as was a request for reconsideration. The Redskins then filed their answer in the litigation, claiming that the retroactive redefinition of "transaction" as applied to them and the retroactive reversal of the Price Commission's approval of the price increases were invalid.

## APPLICABILITY OF EXECUTIVE ORDER 11723 TO THE REDSKINS

The Redskins contend that the court should avoid the constitutional questions certified by construing Executive Order 11723 and the regulations pursuant thereto as inapplicable to them. They argue that the Executive Order was not intended to reach those whose price increases had previously been approved by the Price Commission. However, by stating that a transaction occurs "at the time of performance in the case of services," the Order clearly intended to invalidate price increases already

charged for performances scheduled to occur during the freeze period. There is no indication that the intent of the Order was to exempt increases which previously had been approved as appropriate to an earlier period of economic controls. Both the stipulation of the parties and a letter from the Redskins to the COLC indicate an understanding that the Price Commission had assured the Redskins only that an average ticket price increase of $2.00 would be within the limits of Phase II. The Redskins do not contend that they were ever assured that this authorization would immunize them from the effect of any later changes in the economic stabilization program. The ever-changing economy and the cascade of phases of the stabilization program would have made it clear to anyone that then-present controls could not be expected to remain stable for the indefinite future.

We, therefore, conclude that Executive Order 11723 was intended to limit ticket prices for all athletic events held during the freeze to prices charged during the base period. Since the base period for Redskins' ticket sales was the 1972 season, it was a violation of the Order to charge prices higher than those in 1972 for the games held on August 3 and 10, 1973.

## CONSTITUTIONALITY

Having concluded that Executive Order 11723 was applicable to the Redskins, we consider the question of whether that application was unconstitutional. The constitutional issue certified to our court by the district court is whether such application constituted "an ex post facto law, bill of attainder, a taking of property without just compensation, or a denial of due process of law."

The questions of whether the government's action represents a bill of attainder or a taking of property without just compensation, although included in the certification, were not raised by the Redskins in the district court and were not pursued in this proceeding. In any

case, such arguments have been consistently rejected by our court. *Five Smiths, supra,* 499 F.2d at 1334–1335, and cases cited therein. The ex post facto law and due process issues were raised by the Redskins in the district court and have been briefed and argued here.

■ *Ex Post Facto Law.* Article I, section 9 of the Constitution states, "No Bill of Attainder or ex post facto law shall be passed." An ex post facto law is one which imposes a punishment for ·an act which was not punishable at the time it was committed, or a punishment in addition to that then prescribed. Burgess v. Salmon, 97 U.S. 381, 384, 24 L.Ed. 1104 (1878). The Redskins contend that Executive Order 11723 is an ex post facto law insofar as it punishes them for selling tickets prior to the promulgation of Executive Order 11723 which made the higher prices illegal. They further argue that the government's demand for restitution and civil penalties satisfies the element of punishment necessary to come within the ex post facto law prohibition. We need not reach this latter contention since we agree with the government that the act which was made illegal by the Order was not the selling of tickets prior to the Order's issuance, but the failure to refund the excess prices prior to the games which were played at least seven weeks after the Order. *Five Smiths, supra,* 499 F.2d at 1335; *USC, supra,* 472 F.2d at 1069.

*Due Process.* The Redskins next contend that to apply Executive Order 11723 to them is retroactively to revoke the Price Commission's approval of the price increases, an act which they argue is arbitrary and capricious and a violation of the Due Process Clause of the Constitution. As noted in the discussion of the ex post facto law and the cases cited therein, the transaction definition does not result in a retroactive application of controls.

The government's actions of applying the Order to the Redskins and denying them an exemption from the transaction definition cannot be found to violate

substantive due process unless the actions were not reasonably calculated to effectuate the purposes of the Act and Order. The application of the transaction definition to football ticket prices has previously been upheld by our court in the face of similar challenges to its reasonableness. *Five Smiths, supra; USC, supra.*

The fact that a contract definition of transaction was utilized during the non-freeze periods of Phases II and III does not make use of a performance definition during a freeze period any less reasonable. *USC, supra,* 472 F.2d at 1072. As the COLC explained in its letter to the Redskins' attorney denying the request for reconsideration, a contract definition would have the effect of freezing prices at a higher level. The Council determined that the economic situation of rapidly rising prices which existed prior to the 1973 freeze required imposition of a performance definition to maximally limit price increases. This determination was a reasonable one.

The Redskins, however, contend that the spiraling price increases did not result from increases approved during Phase II, but from those instituted during the Phase III "voluntary controls," and so the freeze should have only affected the Phase III increases. Even ignoring the fact that the Redskins' ticket price increases were not actually implemented until Phase III was underway, it was not irrational to apply a uniform rule to all athletic events occurring during the freeze regardless of whether the prices for advance tickets had been increased during Phase II or III. This is particularly true in view of the understanding by all parties that Phase II approvals were limited to assurances that increases were within Phase II guidelines and were not guarantees that the increases would be valid in some unknown future period.

## RESTITUTION

Section 209 of the Act, as amended, empowers a court to order restitution of moneys received in violation of an order or regulation issued pursuant to the Act. Our court has previously ordered the refund of excess amounts paid for football tickets. *Five Smiths, supra; USC, supra.*

■ In view of the fact that the Redskins complied with the government's request to announce at both games that spectators should retain their ticket stubs for a possible refund, it is appropriate to require the Redskins to make refunds only to those who can produce their ticket stubs. Refunds should be made to those purchasers in the amount the price paid for their tickets exceeded the price for the same seats charged during the 1972 season. We leave to the district court on remand to determine the administrative mechanism to be utilized for the payment of refunds, including such details as notification of purchasers and the time period during which ticket stubs may be presented for refunds.

At oral argument the government suggested that we order that any part of the $180,340.00 overcharge which is not refunded to ticket purchasers of the August 1973 football games be applied to reduce ticket prices during the 1975 football season. We need not reach the question of whether, in view of the expiration of the Economic Stabilization Act, our court would have the authority to order a prospective reduction of prices since, in any event, we believe that the circumstances of this case do not warrant such an order.

## CIVIL PENALTIES

■ The government in its complaint and in this proceeding asks the court to impose against the Redskins the maximum civil penalty of $2,500 for each violation, or $5,000 for the two games. Section 208(b) of the Act and Section 7 of Executive Order 11723 authorize such a penalty for violations of orders or regulations.

The assessment of a civil penalty rests within the discretion of the court and, in

our view, this would be an inappropriate occasion for imposition of a penalty.

In light of the foregoing, the United States is entitled to judgment as a matter of law that the Redskins violated Executive Order 11723 in charging ticket prices in excess of the freeze base price for games played on August 3 and August 10, 1973. The case is remanded to the district court with directions to enter judgment for the United States in accordance with this opinion and to implement the restitution ordered herein.

Remanded with directions.

ROBERT P. ANDERSON, Judge (dissenting):

As my views concerning the pertinent regulations, the action taken by the COLC and the Price Commission, and the applicable law, differ from that of the majority, I must respectfully dissent from its holding.

The present case arose during Phase II (November 13, 1971 to January 12, 1973) and Phase III (January 13, 1973 to, at least, June 13, 1973), during which the Phase I definition of "transaction" was no longer operative. In its place, between December 15, 1971, the effective date of 6 C.F.R. § 300.51 issued by the Cost of Living Council, and June 13, 1973, the effective date of Executive Order 11723, there was in force the regulation, § 300.51, above cited, which provided that ". . . a service organization . . . may not charge a price in excess of the base price . . . until the Price Commission has approved that price in excess of the base price . . . ." The "base price" for purposes of this regulation was defined as the highest price charged by the seller for a "transaction" in a similar service during the period August 16 to November 13, 1971. 6 C.F.R. § 300.405. "Transaction" was defined as ". . . an arms-length transaction . . . and is considered to occur at the time and place a binding contract is entered into between the parties." 6 C.F.R. § 300.50. The Price Commission established in a formal determination, 38 Fed.

Reg. 3997, that, for the purpose of determining the base price for advance ticket sales for sporting events, ". . . the transaction occurs at the time the tickets are sold . . . ."

During this period the Washington Redskins applied to the Price Commission in late 1972 to increase the price of its tickets for its 1973 games by an average of $2 a ticket. The Price Commission in December 1972 granted the Redskins authority to make the increase; and, in reliance on this ruling and the regulation defining the word "transaction" as occurring when a binding contract is entered into between sellers and purchasers of tickets, the Redskins, in March 1973 announced the increase in the price of the tickets for the 1973 games. It sold the tickets before June 1973 and expended or committed itself to expend substantially all of the proceeds, amounting to approximately $180,000, in preparation for the games to be played later in the year.

Thereafter the President promulgated Executive Order 11723 which provided that from June 13 to August 12, 1973 (the 1973 freeze period) it was unlawful for a seller to charge a price for any commodity or service which exceeded the highest price charged during a "transaction" in a similar commodity or service which was completed either during June 1 to June 8, 1973 or, if there was none during that time, then during the nearest 7-day period in which such a transaction was completed. The order completely changed the definition of "transaction" so that the relevant event for the determination of the base price was not the making of the contracts for the sale of the tickets, but the actual playing of the game, as it had been during Phase I. The Redskins had scheduled two games which came within the freeze period; the Department of Justice charged that the increased price paid to the Redskins for the 1973 season was unlawful under the Executive Order and that the price could not exceed that charged in 1972. This action resulted.

The position of the majority is that, although the Redskins had acted in good faith on the express authority of the Price Commission, and the making of the contracts had been completed in full conformity with the Commission's ruling and the existing regulations, nevertheless, the intervention of the changed definition of "transaction" before the games were actually played, in effect, rendered nugatory the administrative regulation as it existed in December 1972 and the administrative determination made within its provisions pursuant to which the Redskins had sold the tickets.

In my opinion a grave difficulty with such a holding in the present case is that, although Executive Order 11723 defined "transaction" as the "playing of the game," neither it nor the statute underlying it, made any provision for the retroactive abrogation of a regulation and ruling of the Price Commission lawfully made and the setting aside of the lawful actions taken in good faith by a person in whose favor the ruling was made, thus subjecting the person to loss and possible penalty. The Government's claimed power rests on nothing more than a so-called clarification of Executive Order 11723 in "Freeze Group Question & Answers # 4." It is unsupported by statute. Moreover, neither the Executive Order nor the administrative "clarification" stated, as is required, that it was necessary to the effectiveness of the statutory and regulatory scheme, that the contractual rights of a party in the position of the Redskins be retroactively abolished or that it be compelled to suffer loss as was the case here, even though its rights were acquired through reliance upon a prior administrative determination. Neither the statute nor the legislative history show an intent to clothe the Executive or its administrators with such power.

The majority decision relies largely on two prior decisions of this court which arose out of the sale of tickets for football games where the sales of nearly all of the tickets had been made prior to the imposition of any controls, i. e. prior to August 15, 1971, though they were for games actually played during the freeze of August 15 to November 13, 1971. University of Southern California v. Cost of Living Council, 472 F.2d 1065 (T.E.C. A.), cert. denied, 410 U.S. 928, 93 S.Ct. 364, 35 L.Ed.2d 590 (1973), and DeRieux v. Five Smiths, Inc., 499 F.2d 1321 (T.E. C.A.), cert. denied, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974).[1]

During this initial or Phase I period of control, launched by Executive Order 11615, the definition of the central and governing word, "transaction," in the determination of all of the ticket price cases, meant the playing of the game or the performance of the athletic event and not the making of the contract for, or the actual sale of, the tickets. As the *University of Southern California* and *Five Smiths* cases arose during this Phase I period the appellants in those cases argued that, because no controls at all were operative during the time within which they sold the tickets, they had a perfect right to increase the ticket prices, and that the Office of Emergency Preparedness and the Cost of Living Council could not, by regulation, reach back and declare the sales invalid on the ground that the games had not actually been played, or in other words, the transaction, embraced within the regulations had not yet occurred. This court properly upheld the authority of the executive commissions to invalidate the

---

1. People of State of California v. Simon, 504 F.2d 430 (T.E.C.A.1974), relied on by the appellee is not apposite. In that case this court sanctioned the retroactive application of a regulation promulgated February 21, 1974, by the Federal Energy Administration, abolishing the exemption of state and local governments from oil price controls. Critical to the holding in that case, however, was the issuance of a notice on October 25, 1973, stating that such a change was contemplated and that if it were made, it would be retroactively effective from the date of the notice, i. e. October 25, 1973. The parties adversely affected, therefore, were aware of the proposed change, and any reliance after that date upon the exemption was at their own risk. No such notice was provided in the present case.

price increases in these circumstances. By analogy to these cases the majority upheld the action of the executive authority in ordering the Redskins to refund the increases in ticket prices charged for the 1973 games, actually performed during the 1973 freeze period; but it is my opinion that the *University of Southern California* and *Five Smiths* cases should be distinguished from the case before us.

The regulations which applied to the *University of Southern California* and *Five Smiths* cases were no longer in operation when the Redskins' sales of tickets took place. During the Second Phase, November 13, 1971 to January 11, 1973, and the Third Phase to June 13, 1973, the definition of "transaction," for the purpose of the regulations, was radically changed from the actual rendering of the service, i. e. the playing of the game itself, for which the tickets were bought, to the making of the contract for the sale of the tickets. Price Commission Ruling 1972–73, 6 C.F.R. 349–350 (1973).

The second distinguishing feature of the present case is that the Redskins made application to the Price Commission for the authority to charge an increased price for the 1973 season; and the Price Commission expressly granted the authority and held the increase to be lawful. When, after the tickets had been sold in reliance on the Commission's ruling and the 1973 Executive Order 11723 had been issued, the executive authority, in effect, revoked the Price Commission's ruling of December 15, 1972 and ordered the Redskins to pay back to the purchasers the increase in the price of the tickets, it raised an issue not present in either the *University of Southern California* or the *Five Smiths* cases; and that is whether the executive authority, acting directly or by a Board

or Commission, can reverse a ruling made many months before, which was clearly lawful at the time, on which the petitioner has relied and on the reversal of which it is bound to suffer substantial loss or damage. It was plainly foreseeable at the time of the Commission's ruling that the prices of tickets concerned those to be sold for the 1973 football season, customarily occurring in the late summer and fall; that the Redskins intended to rely and act upon the authority granted by the Commission for which the Redskins had applied; and that it intended to sell the tickets and expend the proceeds well in advance of the opening of the season and in preparation for it. This brings the case within the ambit of "second impression" cases in which an administrative officer or commission by retroactive ruling, reverses a ruling made some time before, which was lawful at the time it was made but which the administrative authority later decides to overrule. This is an area which opens the door to arbitrary and capricious administrative action, and a duty rests upon the courts to safeguard the interests of persons affected by such retroactive changes in regulations and make certain that the retroactively applied changes are justified, are reasonably necessary to meet the emergency for which the legislation was enacted and are under all the circumstances fair and equitable.

The majority hold that the ruling of the COLC in December of 1972 approving the Redskins' increased price for tickets was not *retroactively* set aside by Executive Order 11723 and the implementing action by the COLC, because the Government's actions were directed toward forbidding the playing, during the 1973 freeze, of football games for which tickets had been previously sold. It was, therefore, in their view, prospective in its intended result.[2] But this is

---

2. Actually Executive Order 11723 which imposed the 1973 freeze on prices provided: ". . . no seller may charge . . . a price . . . which exceeds the freeze price . . . ." The event subject to price controls

was the mere "charging" of prices. The Redskins did not charge any prices during the 1973 freeze period, it merely performed services already paid for.

so, if at all, only in an extremely narrow sense, which fails to give consideration to all of the relevant circumstances. The operative effect of the Order and regulations was to invalidate a ruling of the Price Commission, made in December 1972, on which the Redskins relied, expressly authorizing it to increase its ticket prices for the 1973 season. Moreover, the Redskins by relying on the validity of the ruling, was exposed to serious financial loss and damage, as well as possible penalties, when the Executive Order and the regulations with their new definition of "transaction" were put into force with retroactive application. This is just as retroactive in its thrust and consequences as if the executive authority had on June 1, 1972, declared its ruling of December 1972, granting the Redskins the right to increase its ticket prices for the 1973 season, invalid and revoked, without any finding of necessity or justification in meeting an emergency, or any consideration of the reasonableness of the action. If an administrative agency simply by redefining a word, such as "transaction", and calling "incomplete" and "unlawful" a past event which was "complete" and "lawful" at the time it occurred and on which a party, in good faith has relied to its damage, then administrative commissions may at will circumvent judicial scrutiny of unreasonable retroactivity.[3]

This is not to say that the executive authority can under no circumstances make a retroactive ruling or order which reverses a former ruling or order of the same authority. This is a "second impression" ruling and where, following the prior ruling or order, persons in good faith have acted in reliance upon it and a "second impression" reversal will place them in a position where they will suffer loss and damage, the executive authority, in making such a change or reversal, must expressly announce the retroactive effect, the need and justification for placing those who relied upon the earlier ruling or order in a position where they will suffer such damage, and the reasonableness under the circumstances of taking such action.

Retrospective operation should not be given to a statute or administrative regulation which interferes with antecedent rights unless such be the unequivocal import of the terms used in the statute and regulation.

In Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), pursuant to a 1955 Department of Defense regulation, the petitioner made a claim for certain monetary restitution which was rejected by the Department which claimed that the case properly came under a 1960 regulation, issued while petitioner's claim was being processed, and which the Department assert-

---

Moreover, Executive Order 11615, which implemented the Phase I price freeze differed from the language contained in Order 11723 in the following important respect: While Order 11723 provided: ". . . no seller may charge . . . a price . . . which exceeds the freeze price . . . ." Order 11615 read: "No person shall charge . . . *in any transaction* prices . . . higher than those permitted hereunder . . . ." (Emphasis added.) The definition of "transaction" under Order 11615, therefore, was crucial for purposes (1) of establishing the base period price and (2) for determining if an event during the freeze period would be subject to price controls. "Transaction" under Order 11723, on the other hand, was relevant for purpose (1) alone. The holding of this court in both *University of Southern California* and *Five Smiths* rested upon the fact that the defendants had engaged in the "transaction," i. e.

played football games, during the freeze period, for which they charged prices higher than those charged during the last base period transaction. See especially 499 F.2d at 1326–27.

The invalidation of the price increase at issue in this case, therefore, is not clearly contemplated by the Executive Order, and it has not been shown to be critical to the success of the administrative policy embodied in that Order and the implementing regulation.

3. The theory of the majority may also permit administrative agencies in the future to disregard with impunity the strictures imposed by the ex post facto provision of the due process clause, a problem averted in this case by the Court's characterization as "inappropriate" the penalties which the Government had sought to impose.

ed retroactively covered petitioner's claim, but which, to be invoked, would require a preliminary administrative determination, which petitioner argued did not apply to him and was not required under the 1955 regulation. The Supreme Court said:

"Whatever petitioner's rights are, there can be no doubt they matured and were asserted under the 1955 directive. Not until six months after petitioner formally presented his claim to the Department of Defense did the Secretary of Defense issue a new, and substantially revised, regulation concerning 'monetary restitution.' Thus the Government's argument necessarily requires that the 1960 regulation be given retroactive application. As the Court said in Union Pac. R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199, [34 S.Ct. 101, 102, 58 L.Ed. 179,] 'the first rule of construction is that legislation must be considered as addressed to the future, not to the past . . . [and] a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature." ' [footnote omitted] Since regulations of the type involved in this case are to be viewed as if they were statutes, this 'first rule' of statutory construction appropriately applies and under the circumstances, it would be unjustifiable to give the 1960 regulation retroactive effect." 376 U.S. at 160, 84 S.Ct. at 621.

See also Retail Wholesale and Department Store Union, AFL–CIO v. NLRB, 151 U.S.App.D.C. 209, 466 F.2d 380, 390–393 (1972).

This court has confirmed the principles, enunciated in this dissent, relating to retroactive rulings by administrative bodies which set aside prior actions which were lawful when performed. Although the principal issue in the case concerned the right of individuals to pursue a private cause of action for damages, resulting from alleged violations of the Economic Stabilization Act, it had to touch on the matter of retroactive application of a statute or regulation. In Fagundez v. Oakland Raiders Professional Football Club, 498 F.2d 1394 (T.E.C.A. 1974), Judge Carter said at page 1395:

"Plaintiffs have no cause of action based on the 1971 Amendment Act, because that Act was enacted at least four and one-half months after plaintiffs had purchased and received their tickets. Statutes are given only prospective application unless there is a clear and unambiguous legislative intent that they are to operate retroactively. Hassett v. Welch, 303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1938); Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); Soria v. Oxnard School District Board of Trustees (9 Cir. 1972) 467 F.2d 59, 60.

No such intent to make the 1971 Act applicable retroactively so as to create a cause of action ex post facto appears in the statute or the legislative history."

It is my opinion that the Government's motion for summary judgment should be denied; and that the defendant-appellee's counter-motion for summary judgment should be granted and the complaint dismissed.