**Abolghasen Osee YASSINI et al., Plaintiffs and Masoud Mahdjoubi, Plaintiff/Appellant,**

v.

**David CROSLAND, Acting Commissioner, Immigration and Naturalization Service et al., Defendants/Appellees.**

**No. 80–4066.**

United States Court of Appeals, Ninth Circuit.

May 14, 1980.

Bill Ong Hing, San Francisco, Cal., for plaintiff-appellant.

Merrick B. Garland, Spec. Asst. to Atty. Gen., Washington, D. C., Peter A. Schey, Los Angeles, Cal., for defendants-appellees.

* Honorable Elbert P. Tuttle, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. Additionally, the case touches a number of other difficult and potentially important issues

Before TUTTLE,* HUG, and TANG, Circuit Judges.

PER CURIAM:

█ Masoud Mahdjoubi challenges the directive of David Crosland, Acting Commissioner of the Immigration and Naturalization Service (INS), to revoke the deferred departure dates that the INS had previously granted to Iranian nationals in this country. Mahdjoubi contends that this revocation violated his right to due process and violated the procedural requirements of the Administrative Procedure Act and the Freedom of Information Act. At the heart of these contentions is a sensitive issue: was the Crosland directive an independent, "renegade" act of foreign policy, or merely an implementation of the President's response to the Iranian hostage crisis?[1] We find that the Crosland directive was within the scope of the President's stated policy, and reject Mahdjoubi's contentions.

Mahdjoubi was admitted into the United States from Iran as a nonimmigrant student with permission to study at Santa Barbara City College until September 10, 1978. On March 22, 1979 the INS took Mahdjoubi into custody after discovering he was in the country in violation of his status and had begun attending California State University at Los Angeles without permission. The District Director denied his requests for an extension of stay and permission to transfer schools. After two continuances were granted so that he could obtain counsel, Mahdjoubi's deportation hearing was scheduled for April 17, 1979.

On April 16, 1979 then Commissioner Castillo of the INS issued a directive to INS district offices that action should not be taken, prior to September 1, 1979, to deport

intertwining foreign policy, Executive authority, the INS, administrative law, and the constitutional rights of aliens. For reasons appearing in this opinion, we find it unnecessary to decide many of these issues.

Iranian nationals who indicate an unwillingness to return to Iran because of the instability of the conditions then existing in that country. The directive specified that hearings which had commenced should go forward, although departure should not be enforced prior to September 1, 1979. Nonimmigrant Iranian nationals who accepted deferred voluntary departure would not be reinstated to a nonimmigrant status upon expiration of the departure period.

Apparently, the INS considered Mahdjoubi's case to be one in which a hearing had "commenced" because it had already been scheduled. After one more continuance, Mahdjoubi's deportation hearing was held on May 1, 1979. Mahdjoubi was found deportable because he had overstayed his visa and had transferred schools without permission.[2] The immigration judge granted Mahdjoubi voluntary departure until September 15, 1979, two weeks beyond the departure date established by Commissioner Castillo.

On August 9, 1979 the INS, in consultation with the Secretary of State, extended the September 1, 1979 departure date until June 1, 1980. It explained that it granted a nine-month extension because a large proportion of Iranian nationals in the United States were students enrolled in nine-month programs. Accordingly, Mahdjoubi's departure date was extended to June 1, 1980.

On November 4, 1979 Iranian militants invaded the United States Embassy in Tehran and took approximately 65 United States citizens hostage in order to force this country to meet their demands. As part of his response to the crisis, President Carter on November 10, 1979 directed the Attorney General to identify any Iranian students in the United States who were not in compliance with the terms of their entry visas, and to take the necessary steps to commence deportation proceedings against those who have violated applicable immi-

gration laws and regulations. On November 13 the Attorney General issued a regulation, 8 C.F.R. § 214.5, requiring Iranian students to report within 30 days to their local INS office to provide information relevant to their immigration status.[3]

Also on November 13, Commissioner Crosland issued a directive rescinding the June 1980 deferred departure. Each Iranian who had received the benefit of deferred departure was to be notified of the revocation and that departure was required on or before 30 days from date of the notice. Mahdjoubi was notified by mail that his deferred departure was revoked and that he was ordered to appear for deportation on November 29. At Mahdjoubi's request, his departure was extended to January 29.

Instead of departing, Mahdjoubi sued, along with several others, to contest the legality of the Crosland directive. The district court certified the Iranian nationals as a class and dismissed the case on the merits. This court vacated the class certification and dismissal, and remanded for proceedings as to the named plaintiffs. *Yassini v. Crosland,* 613 F.2d 219 (9th Cir. 1980). Mahdjoubi's attempts to reopen his deportation proceeding and to gain reinstatement of voluntary departure were denied, and he was ordered to report for deportation on February 15, 1980. Mahdjoubi moved for a temporary restraining order and a stay of deportation in the district court. After the district court denied relief, Mahdjoubi appealed to this court. The court granted Mahdjoubi a stay of deportation pending appeal.

I.

Compliance with the APA

Mahdjoubi does not claim that the INS does not have the authority to grant or revoke deferred departure. Rather, he contends that the Crosland directive should be

---

2. Mahdjoubi states that he did not contest deportation because he anticipated that his deferred departure would be continued until June 1980, and he expected to have completed his studies by that time. According to the work-

sheet of the immigration judge, however, Mahdjoubi contested his deportability.

3. The legality of this order was upheld in *Narenji v. Civiletti,* 617 F.2d 745 (D.C.Cir.1979).

declared void under 5 U.S.C. § 706(2)(D), because it was a "rule" that had not been promulgated in accordance with the formal rulemaking procedures of the Administrative Procedure Act, specifically 5 U.S.C. § 553(b), (c), and (d), which require public notice and comment before a proposed rule takes effect.

■ We find it unnecessary to decide whether the Crosland directive is a "rule" under the APA. We assume arguendo that it is a rule, but conclude that it is exempt from APA rulemaking procedures under the "good cause" and "foreign affairs function" [4] exceptions to those procedures. *See* 5 U.S.C. §§ 553(b)(B) and 553(a)(1).

■ The good cause exception applies when compliance with the notice requirements are "impracticable, unnecessary or contrary to the public interest." *Id.,* § 553(b)(B). *See generally United States Steel Corp. v. EPA,* 605 F.2d 283 (7th Cir. 1979), *cert. denied,* — U.S. —, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). The good cause urged here by the Government is that the public interest warranted a prompt response to the embassy takeover in Iran. This is essentially the basis for its argument that the foreign affairs exception applies. Analytically, then, the question whether the public interest excuses notice and comment under § 553(b)(B) appears to be the equivalent of the question whether a foreign affairs function excuses notice and comment under § 553(a)(1). Our discussion, therefore, spans both subsections of the statute.[5]

Central to the resolution of these issues is whether Commissioner Crosland was acting independently of the President and Attorney General and in effect announcing his own foreign policy, or merely implementing the expressed foreign policy of the President. Mahdjoubi argues that the Crosland directive was outside the scope of the President's directive and without the explicit support of the President or Attorney General. The Government argues that it was within the scope of the directive and with the approval of the President and Attorney General.

■ Decisions involving the relationships between the United States and its alien visitors often implicate our relations with foreign powers, and because of their political nature, are generally more within the competence of the Legislative and Executive Branches than the Judiciary. *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). A rule of law Legislative and Executive Branches than the Judiciary. *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). A rule of law that would inhibit the flexibility of the political branches should be adopted with only the greatest caution, and judicial review of decisions made by the Congress or the President in this area is limited. *See id.* at 81–82, 96 S.Ct. at 1892; *Hampton v. Mow Sun Wong,* 426 U.S. 88, 101 n.21, 96 S.Ct. 1895, 1904 n.21, 48 L.Ed.2d 495 (1976). Review of decisions involving aliens nevertheless remains available, and we recognize that serious questions might arise if the INS engaged in foreign policy matters, outside the scope of its usual functions, with disregard of the APA and concepts of due process. *See Mow Sun Wong,*

---

4. The foreign affairs exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs. *See Hou Ching Chow v. Attorney General,* 362 F.Supp. 1288 (D.D.C. 1973). For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences. S.Rep. No. 752, 79th Cong., 1st Sess. 13 (1945). As we discuss, this is the case here.

5. The good cause exception also contains a requirement that the agency invoking the exception incorporate a finding of good cause and reasons within the rule. The Government did not incorporate such a finding here. Courts have disagreed over the effect of such an omission. *Compare DeRieux v. Five Smiths, Inc.,* 499 F.2d 1321, 1333 (Em.App.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974) (mere technical violation where reasons for good cause are obvious and compelling) *with Kelly v. Department of Interior,* 339 F.Supp. 1095, 1101 (E.D.Cal.1972) (omission is fatal). In light of our reliance on the foreign affairs exception, we need not resolve this question, although we find the reasons invoking the good cause requirement obvious and compelling.

426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495. We are convinced, however, that that is not the case here.

The affidavits of the Attorney General and Deputy Secretary of State Warren Christopher presented by the Government in the district court showed that the President frequently consulted with the Attorney General and the Secretary of State at the onset of the Iranian crisis, and that the Attorney General conferred with Commissioner Crosland. Commissioner Crosland averred that he issued the directive only after he consulted with the Attorney General; and that the directive was designed to further the policy expressed in the Presidential directive and to aid the President's efforts to secure the release of the hostages.

Mahdjoubi argues that these statements do not disprove his argument that Commissioner Crosland was acting on his own authority, because there is no specific indication from either the President or the Attorney General that the Crosland directive was issued with their approval. Although it is true that the Government could have presented better documentation of its position, the Government's affidavits support the conclusion that the Crosland directive was an integral part of the President's response to the crisis.

█ Even if we had some reservation about the source of Commissioner Crosland's authority, we doubt whether Mahdjoubi has standing to challenge the legality of the directive. Mahdjoubi argues that the Crosland directive went beyond the scope of the Presidential directive of November 10, because the Crosland directive applied to all Iranian nationals, either lawfully or unlawfully within the country, whereas the Presidential directive applied only to Iranian students who were here unlawfully. As the record plainly indicates,

Mahdjoubi is an Iranian student who more than once has been adjudged to be a student unlawfully in the country. Thus, even if the Crosland directive was broader in some respects than the President's pronouncement, it was within the scope of the President's directive as applied to Mahdjoubi's status.[6]

Because Commissioner Crosland was implementing the President's foreign policy, we find that the Crosland directive, as applied to Mahdjoubi, fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA.

## II.

### Publication

█ Mahdjoubi contends that, even if his APA claim fails, the Crosland directive is void because it was "an interpretation of general applicability" that was not published in the Federal Register as required by 5 U.S.C. § 552(a)(1)(D), a provision of the Freedom of Information Act.

We assume for the sake of argument that the Crosland directive is an interpretation of general applicability. *See Anderson v. Butz*, 550 F.2d 459, 463 (9th Cir. 1977). Title 5 U.S.C. § 552(a)(1) provides in part:

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

However, we find that Mahdjoubi did have actual and timely notice of the Crosland directive and thus the directive may be applied to him.

The Crosland directive was issued on November 13, 1979. Contemporaneously, the

---

**6.** Mahdjoubi argues that the Crosland directive was overbroad as applied to him, because once Mahdjoubi had received a deferred departure date, he became an Iranian student "lawfully" in the country. Because the express purpose of the President's directive was to enforce the immigration laws against Iranian students unlawfully in the country, it would be anomalous

if Mahdjoubi, as one already adjudged to be an unlawful Iranian student, was in a better position than those whose status was uncertain. Even if the President's directive was ambiguous as to whether it applied to those subject to deferred departure, in this sensitive foreign policy area we would resolve the ambiguity in favor of the President.

INS sent notice of the directive to all affected Iranian nationals. Mahdjoubi acknowledges that he received notice of the directive on November 16, 1979. Because, as Mahdjoubi implicitly concedes, the directive would not have been invalid under § 552(a)(1) if published in the Federal Register, we fail to see how the statute is violated when Mahdjoubi received actual, personal notice of the directive immediately after its issuance. Any violation in these circumstances would be hypertechnical and contrary to the statutory scheme which permits actual and timely notice as an alternative to publication.

Mahdjoubi argues that his notice was not "timely" because the directive went into effect before he learned about it, citing *Anderson v. Butz*, 550 F.2d 459 (9th Cir. 1977). In *Anderson*, the challenged food stamp regulation negatively affected the plaintiffs before they received actual notice. In this case, the directive did not require the Iranian nationals to depart immediately. *Power Agency v. Morton*, 396 F.Supp. 1187, 1191 (D.D.C.1975), *aff'd*, 539 F.2d 243 (D.C.Cir.1976). In this case, mail notice was a "timely" substitute for publication because Mahdjoubi received it well in advance of the date he was required to depart.

### III.

### *Hampton v. Mow Sun Wong*

Mahdjoubi makes two due process claims. The first is that the Crosland directive violated his right to due process as articulated by the Supreme Court in *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976).

In *Mow Sun Wong*, the plaintiffs were permanent resident aliens who were denied federal government employment because a Civil Service regulation required all government employees to be United States citizens. In response to the plaintiffs' challenge to the regulation, the Civil Service Administration asserted that the regulation was justified by certain federal interests in immigration and naturalization. The court

ruled that the regulation affected a liberty interest of the plaintiffs, and that the procedures employed by the Civil Service to deprive the plaintiffs of that interest were violative of due process. The court held that due process required that there be a legitimate basis for presuming that the rule was actually intended to serve the Government's asserted interest. If the agency which promulgates the rule has the direct responsibility for protecting that interest, or if the rule was expressly mandated by Congress or the President, it may reasonably be presumed that the asserted interest was the actual predicate for the rule. If not, the rule must be justified by reasons that are properly the concern of the agency.

The parties discuss at some length whether deferred departure created a liberty or property interest protected by due process requirements. Mahdjoubi argues that, under the well-established policies of the INS to grant deferred departure to the nationals of countries in political turmoil (its "temporary sanctuary program"), he has a legitimate claim of entitlement to the deferred departure date. The Government argues, with perhaps less than complete candor, that there is no temporary sanctuary program, and that the deferred departure was simply a form of voluntary departure which is purely a "matter of grace."

■ Whether Mahdjoubi had a legitimate claim of entitlement to the extended departure date is a matter that we need not decide. We have already held that the Crosland directive as applied to Mahdjoubi was within the scope of the President's directive. Under *Mow Sun Wong*, therefore, it was procedurally proper for the INS to issue the directive as a means of implementing the President's response to the crisis. Thus, we presume that the reason advanced here by the Government for the Crosland directive—it was an integral part of the President's response to the crisis in Iran—is in fact the reason for its issuance. We find no violation of procedural due process.[7]

---

7. We do not understand Mahdjoubi to argue that, if he has not been denied procedural due process, the Crosland directive is nevertheless a violation of substantive due process. Given

## IV.

### Notice and Hearing

Mahdjoubi makes a second procedural due process claim. He contends that he could not be deprived of a liberty or property interest without prior notice and hearing. Once again assuming that Mahdjoubi had a legitimate claim of entitlement to the June 1, 1980 deferred departure date, we find no deprivation of due process.

 Mahdjoubi's due process claim is rather vaguely articulated. Mahdjoubi may be arguing that he should have had a prior opportunity to contest Commissioner Crosland's decision to rescind deferred departure. Where an agency action is not based on individual grounds, but is a matter of general policy, no hearing is constitutionally required, especially where, as in this case, there is a post-decision review. *See e. g., Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Bi-Metallic Investment Co. v. Colorado*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915).

 If Mahdjoubi is arguing that he should have been given a hearing to contest the directive's application to his status, we cannot see how he has been prejudiced by such a lack of notice and hearing. His only possible defense to the application of the directive would be that he is not an Iranian who obtained deferred departure; Mahdjoubi, however, does not allege such a defense. Moreover, he had the opportunity to raise such a defense in his administrative actions commenced after the revocation of deferred departure.

Finally, if Mahdjoubi contends that he was denied an opportunity to contest the underlying grounds for his deportation, we must disagree. Mahdjoubi has been afforded a full opportunity to be heard on the merits of the legality of his status, both before [8] and after the issuance of the Crosland directive. He has made no showing that he was not out of status or that he was otherwise entitled to relief.

The judgment of the district court is affirmed.

that the President's actions were made in response to a sensitive area of foreign policy, Mahdjoubi would have a heavy burden of showing such a violation. *See Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1970); *Narenji v. Civiletti*, 617 F.2d 745 (D.C. Cir. 1979).

**8.** Prior to this appeal, Mahdjoubi contended that he did not seriously contest deportation at his May 1, 1979 hearing in reliance on the offer of deferred departure. At the time Mahdjoubi opted for deferred departure, the deferred departure date was only September 1, 1979; deferred departure was extended to June 1, 1980 *after* Mahdjoubi's hearing. Mahdjoubi's claim of prejudice, therefore, is illusory. Even assuming that there existed facts by which Mahdjoubi could have opposed deportation, Mahdjoubi chose to forego presenting that defense for the right to remain until September 1979, a time that has long since passed.