Layla NAJAFI, Plaintiff,

v.

Benjamin CIVILETTI et al., Defendants.

No. 80–0595–CV–W–5.

United States District Court,
W. D. Missouri, W. D.

March 5, 1981.

Robert A. Bailey, Jackson & Sherman, Kansas City, Mo., for plaintiff.

Ronald S. Reed, U. S. Atty., Mark Zimmermann, Asst. U. S. Atty., Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

SCOTT O. WRIGHT, District Judge.

Invoking this Court's jurisdiction pursuant to 28 U.S.C. § 1331, Layla Najafi, an Iranian national, brings this action seeking declaratory and injunctive relief. Under regulations promulgated by the Immigration and Naturalization Service (INS) during the recently concluded Iranian crisis, plaintiff has been denied a change in her alien classification status and is presently subject to deportation. Plaintiff asks that the Court declare these regulations unconstitutional, that the Court enjoin the United States Attorney General from initiating deportation proceedings against plaintiff and that the Court grant her the change in classification that she has been denied by the INS. The government responded to plaintiff's complaint with a motion to dismiss and, following proper notice to the parties, the Court heard oral argument on this motion. Before ruling on this motion, a brief recitation of the pertinent facts is in order.

On November 4, 1979, the United States Embassy in Tehran, Iran was invaded by militant Iranian students and 52 American citizens were taken hostage. Negotiations concerning the release of the hostages were held over the next few months, but when the negotiations appeared to have failed, President Carter severed diplomatic relations with Iran on April 7, 1980. Simultaneously, the President ordered that certain steps be taken to make it "clear that the failure to release the hostages will involve increasingly heavy costs to Iran and to its interests." President's Announcement of Sanctions Against Iran, 16 Weekly Comp. of Pres.Doc. 611 (April 7, 1980). Among other punitive measures, the President directed the Secretary of State and the Attorney General to invalidate all visas issued to Iranian nationals for future entry into the United States and not to reissue visas to

Iranian aliens already in the United States. Subsequently, on April 15, 1980, David Crosland, Acting Commissioner of the INS, issued certain orders amending INS regulations. He took this action pursuant to the authority delegated to him by the Attorney General under the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 *et seq.* By virtue of these amendments, an Iranian nonimmigrant alien was not eligible for an extension of his or her stay unless one of the two following requirements was satisfied: (1) the alien was in immediate need of urgent medical treatment which was available only in the United States, or (2) the alien had a relationship to a United States citizen or a lawful permanent resident which fell within one of the categories specified in the Act. The applicable regulations were also amended to read as follows: "A nonimmigrant alien who is an Iranian national is ineligible for any change of nonimmigrant classification other than a change to classification under section 101(a)(15)(G) of the Act." 8 C.F.R. § 248.2. Because the foregoing amendments were promulgated in accordance with the President's proclamation of April 7, 1980, and in response to the international crisis created by the seizure of American citizens at the Embassy in Tehran, the formal rulemaking procedures prescribed in the Administrative Procedure Act, 5 U.S.C. § 553(b), were not followed and the amendments became effective immediately.

Plaintiff Najafi entered the United States in August, 1979 as a nonimmigrant visitor and was issued a visa authorizing her to stay in this country until October 20, 1979. Prior to the expiration of her visa, plaintiff applied for and was granted an extension of her stay until April 20, 1980. After she procured this extension, plaintiff, on February 11, 1980, applied for a change in her alien classification status. Najafi requested that her status be changed from nonimmigrant visitor to nonimmigrant student. She allegedly sought the classification change in order to enroll at Drury College in Springfield, Missouri where she intended to pursue a course of study which eventually would culminate in a degree in business administration. But on April 18, 1980, Robert Rumbough, the District Director of the INS office in Kansas City, Missouri, denied plaintiff's application for a change in status. In denying her application, the District Director stated that a change in nonimmigrant classification fell within the Attorney General's discretion and that "the Attorney General, in accordance with the President's initiative, has determined not to exercise his discretionary authority favorably in behalf of Iranian applicants for change of nonimmigrant status." Najafi appealed the District Director's decision to the Regional Director of the INS, but on May 21, 1980, the Regional Director dismissed her appeal on the ground that, as an Iranian national, she was ineligible for a change in classification under the recently amended regulations.

Following an unsuccessful attempt to appeal the Regional Director's ruling to the Board of Immigration Appeals, plaintiff commenced the instant action in district court on June 24, 1980. The next day, June 25, 1980, after meeting with counsel for the parties in chambers, the Court entered a temporary restraining order enjoining defendants from commencing any proceeding to deport plaintiff from the United States. Although no such action had yet been initiated, this order was issued to preserve the status quo until the precise nature of plaintiff's lawsuit and the relief she sought could be better ascertained. Under the provisions of Fed.R.Civ.P. 65(b) the Court's restraining order expired ten days after its issuance and it has not been renewed. Moreover, upon consideration of defendants' motion to dismiss and the circumstances of this case, the Court has determined that plaintiff's lawsuit is premature and should be dismissed.

■ Layla Najafi is an "alien" as that term is defined in the Immigration and Nationality Act of 1952. 8 U.S.C. § 1101 *et seq.* That is, she is a person who is not a citizen or national of the United States, 8 U.S.C. § 1101(a)(3), and, therefore, she is subject to the provisions of the Immigration and Nationality Act. Through this Act,

Congress has legislated on a wide range of matters affecting aliens who seek or have already established some connection with the United States. In general, the Act charges the Attorney General "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens" and authorizes him to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this [Act]." 8 U.S.C. § 1103(a).

█ Under the Act aliens are divided into two broad categories—immigrants and nonimmigrants. An immigrant alien is defined as a person who lawfully enters the United States for the purpose of residing in this country permanently. 8 U.S.C. § 1101(a)(20). Nonimmigrant aliens, however, are admitted into the United States for some specific purpose, e. g., work, school, tourism, etc., and only "for such time and under such conditions as the Attorney General may by regulations prescribe." 8 U.S.C. § 1184(a). Absent a change in status or an extension of his stay, a nonimmigrant alien must leave the United States upon expiration of his visa. 8 U.S.C. § 1184(a). Should a nonimmigrant alien fail or refuse to leave the country upon expiration of his visa, he will become a nonimmigrant alien who is "out-of-status" and subject to deportation. 8 U.S.C. § 1251(a)(9). Deportation, however, is not regarded as punishment for unlawful conduct, but rather is more in the nature of a civil proceeding. *Pilapil v. Immigration and Naturalization Service*, 424 F.2d 6, 10 (10th Cir. 1970). The deportation process is commenced by the issuance and service of an order which calls upon the respondent to show cause why he should not be deported. The order to show cause will set a time and place for a hearing before a special inquiry officer and the respondent, who has the right to be represented by legal counsel, must be given the opportunity to present evidence and argument on his behalf. If the hearing officer determines that the respondent should be deported, this decision may be appealed to the Board of Immigration Appeals. The Board's decision is in turn appealable and the respondent has a statutory right to file a petition for review in the appropriate Court of Appeals. 8 U.S.C. § 1105a. Additionally, if the respondent is for some reason held in custody during the pendency of the deportation proceeding, he may seek judicial redress by filing a petition for writ of habeas corpus.

█ Although the foregoing is merely a brief summary of the deportation process, it does reveal that the statutory framework established by Congress is replete with procedural safeguards to insure that aliens subject to deportation are given a meaningful opportunity to present their objections to deportation. Moreover, because of the special judicial deference usually accorded Congress in the area of immigration and naturalization legislation, *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977), the courts are reluctant to interfere with the administrative process.

█ In deportation proceedings, as in other situations in which administrative remedies have been provided, the courts ordinarily will not consider complaints that attempt to circumvent or preempt the administrative process, *Florentine v. Landon*, 206 F.2d 870, 871 (9th Cir. 1953), *cert. denied*, 347 U.S. 927, 74 S.Ct. 530, 98 L.Ed. 1080 (1954), and, even though an alien might prefer to seek relief directly from the court, the initial consideration and disposition of an alien's arguments against deportation should be channeled through the administrative machinery created by Congress.[1]

---

1. Quite frequently, "[a] person against whom a deportation proceeding is brought may feel that the proceeding is unjustified and illegal. But generally he has no right to go to court immediately to stop the proceeding. Congress has provided an administrative device for passing upon an alien's deportability and he generally must obtain a final administrative ruling before he can go to court." 2 Gordon & Rosenfield, *Immigration Law and Procedure* § 8.4b (1980).

■ Upon examination of the facts of plaintiff's case, the Court finds that this is a particularly inappropriate case for judicial intervention. Plaintiff would have the Court determine that she is not subject to deportation because the regulations relied upon by the INS in denying her request for a classification change are allegedly unconstitutional.[2] However, although plaintiff admittedly was out-of-status and subject to deportation at the time she filed her lawsuit, the INS had not taken any steps to initiate a deportation proceeding against her. Under these circumstances, where the administrative procedures for relief have not yet been tested, the Court believes that plaintiff's action is premature.[3] *See, e. g., Small v. Kiley*, 567 F.2d 163, 165 (2d Cir. 1977); *Lennon v. Richardson*, 378 F.Supp. 39, 42 (S.D.N.Y.1974). Once the deportation process has begun, plaintiff will have ample opportunity to raise in an orderly fashion the issues she attempts to have this Court decide. Plaintiff need not fear that her constitutional arguments will be ignored or foreclosed if not properly preserved in the administrative proceeding, since such issues may be independently reviewed by the court of appeals following plaintiff's exhaustion of her administrative remedies. *Pilapil v. Immigration and Naturalization Service*, 424 F.2d 6, 9 (10th Cir. 1970).

■ Finally, the Court notes that plaintiff's attempt to avoid or preempt the administrative process cannot be justified on the ground that this case involves special circumstances or that plaintiff is in danger of suffering irreparable harm. Although plaintiff will be forced to submit to the burden of undergoing the administrative hearing process, this in itself does not constitute the sort of "irreparable harm" that would justify the granting of the injunctive relief plaintiff seeks. Nor can it be said, "in view of the protracted nature of deportation proceedings and the availability of relief even after entry of a final order of deportation," *Small v. Kiley*, 567 F.2d 163, 165 (2d Cir. 1977) (footnote omitted), that plaintiff is in imminent danger of being deported. Consequently, in the absence of any circumstances which would excuse plaintiff's failure to utilize her administrative remedies, the Court declines to interfere with the normal administrative process and plaintiff's complaint will be dismissed. Therefore, in accordance with the foregoing memorandum and order, it is hereby

ORDERED that defendant's motion to dismiss be, and is hereby, granted and plaintiff's complaint is dismissed. Each party shall bear its own costs.

2. The Court expresses no opinion as to the constitutionality of the questioned regulations. The Court does note, however, that other regulations directed solely at Iranian nationals and issued during the hostage crisis have been subjected to constitutional attacks similar to those made here. In each instance the regulations were upheld as a valid exercise of executive authority. *See Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980); *Narenji v. Civiletti*, 617 F.2d 745 (D.C.Cir.1979); *Hamlehdary v. Civiletti*, No. 80–4148 (D.Kan. June 18, 1980).

3. In a similar vein, the Court questions whether plaintiff's constitutional claims are ripe for decision. "Ripeness" is a judicially-created doctrine that

reflects the tradition that courts, having final power, can exercise it most wisely by restricting themselves to situations in which decision is necessary. In part, it is founded on the practical wisdom of not coming prematurely or needlessly in conflict with the executive or legislature.

*Joint Anti-Facist Refugee Committee v. McGarth*, 341 U.S. 123, 155, 71 S.Ct. 624, 639–40, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Recognizing the importance of the ripeness doctrine, our court of appeals recently emphasized that courts should "avoid passing upon constitutional questions in advance of the strictest necessity for deciding them" and cautioned against assuming jurisdiction over complaints raising constitutional issues if it is unnecessary to determine them. *Bergstrom v. Bergstrom*, 623 F.2d 517, 519 (8th Cir. 1980).