# Executive Power with Regard to the Libyan Situation

[The following memorandum reviews the significant statutory authorities available to the President and other executive officials in dealing with a foreign policy crisis.]

December 23, 1981

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL, THE DEPUTY ATTORNEY GENERAL, AND THE ASSOCIATE ATTORNEY GENERAL

To assist you in deliberations regarding Libya, we are providing a general memorandum concerning statutes likely to be significant.

### A. The International Emergency Economic Powers Act

The President has wide-ranging power to regulate property and transactions in which a foreign country has an interest under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (Supp. III 1979), enacted in 1977. IEEPA was used during the Iran hostage crisis: (1) to block Iranian government property in this country; (2) to limit exports and imports to Iran; (3) to restrict transactions with any foreign person or entity relating to travel to Iran; and (4) to make the required transfers of funds in connection with the agreement ending the hostage crisis. *Dames & Moore v. Reagan*, 453 U.S. 654 (1981); *e.g.*, Exec. Order No. 12,170, 44 Fed. Reg. 65,729 (1979); Exec. Order No. 12,205, 45 Fed. Reg. 24,099 (1980); Exec. Order No. 12,211, 45 Fed. Reg. 26,685 (1980). It continues to be used today to implement various financial aspects of the settlement with Iran.

The IEEPA provides broad powers to the President in the event of any:

> unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

50 U.S.C. § 1701. If such an emergency is declared, the President may:

under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1). Under these provisions, once the President declares a national emergency, he may control all foreign assets subject to the jurisdiction of the United States, regulate or prohibit movements of foreign or domestic currency or credit in and out of the country, and prohibit all transactions involving any property in which the foreign country or any national thereof has an interest.

If a decision is made to invoke IEEPA, certain steps must be taken immediately under that Act and the National Emergencies Act, 50 U.S.C. §§ 1601–1651. The latter Act confers no separate authority, but imposes procedural requirements.

(1) *Consultation with Congress:* The President, "in every possible instance," shall consult with Congress *before* exercising authorities under the IEEPA. 50 U.S.C. § 1703(a). There is no formal procedure for this. It has usually been done with only a small group of congressional leaders.

(2) *Declaration of a national emergency:* A proclamation of national emergency is necessary to use the powers available under IEEPA. 50 U.S.C. § 1701. The President is authorized to declare an emergency pursuant to the National Emergencies Act. 50 U.S.C. § 1621. For purposes of IEEPA, such an emergency may be declared with respect to any unusual and extraordinary threat to the national security, foreign policy, or economy of the United States which has its source outside this country. 50 U.S.C. § 1701. This language was left broad to provide necessary discretion. H.R. Rep. No. 459, 95th Cong., 1st Sess. 10 (1977).

433

A presidential declaration of emergency under IEEPA can be short and to the point. In the Iran crisis, the President stated: "I find that the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and hereby declare a national emergency to deal with that threat." Exec. Order No. 12,170, *supra*, 44 Fed. Reg. 65,729. The courts will not review a determination so peculiarly within the province of the President. *See* 42 Op. Att'y Gen. at 370.

Under the Act, Congress is authorized to terminate a declared emergency through adoption of a concurrent resolution. 50 U.S.C. § 1706(b) (Supp. III 1979). It is our position that a concurrent resolution, because it would not be subject to the President's veto, would be constitutionally insufficient to terminate a declared emergency.

(3) *Designation of Act:* The National Emergencies Act declares that in the same proclamation or by contemporaneous or subsequent executive orders, the President must designate the particular emergency statute he wishes to invoke, *e.g.,* IEEPA. The 1979 Iranian blocking order and emergency declaration appeared in the same document. Exec. Order No. 12,170, *supra*, 44 Fed. Reg. 65,729.

(4) *Delegation:* Since IEEPA vests powers directly in the President, an executive order should delegate power to an appropriate official. 3 U.S.C. § 301. This could be the Secretary of the Treasury, who already administers similar programs. The President could declare a sanction in general terms and delegate to an appropriate official the powers to administer the sanction and enforce the Act. This was done with the 1979 Iranian blocking order; doing so would avoid any enforcement gap between the issuance of the proclamation and implementation of the regulations by Treasury.

(5) *Publication and transmittal to Congress:* The National Emergencies Act requires that the emergency proclamation be immediately transmitted to Congress and published in the Federal Register. 50 U.S.C. § 1621.

(6) *Report to Congress:* Following the issuance of the order, the President shall "immediately" transmit a report to the Congress specifying:

> (1) the circumstances which necessitate such exercise of authority;
>
> (2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;
>
> (3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

434

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

50 U.S.C. § 1703(b).

The legislative history indicates that this requirement was not to impede use of emergency power. The House report notes:

Nothing in this section should be construed as requiring submission of a report as a precondition of taking action where circumstances require prompt action prior to or simultaneously with submission of a report.

H.R. Rep. No. 459, *supra*, at 16.

The Department of State is currently drafting appropriate report language which, once approved by concerned agencies, can be incorporated immediately into final documents.

IEEPA provides for prison sentences of up to 10 years and fines up to $50,000. Officers, directors, and agents of corporations are specifically covered by this provision if they knowingly participate in violations. Civil fines of up to $10,000 may also be imposed.

### B. The Trading With the Enemy Act

The Trading with the Enemy Act, as amended in 1977, is available only during a war. 50 U.S.C. App. § 5(b) (Supp. III 1979). The key language of IEEPA quoted above (describing the powers available to the President) was based on the Trading with the Enemy Act, which retains comparable provisions. In addition, broader powers are available under the Trading with the Enemy Act, including the authority to vest enemy property (a process by which the government seizes and takes title to it) and to control wholly domestic transactions. 50 U.S.C. App. § 5(b).

### C. Passport Restrictions

The Passport Act, as amended in 1978, deals with the power of the Secretary of State to restrict the use of passports. It provides:

Unless authorized by law, a passport may not be designated as restricted for travel to or for use in any country other than a country with which the United States is at war, where armed hostilities are in progress, or where there is imminent danger to the public health or the physical safety of United States travellers.

22 U.S.C. § 211a (Supp. III 1979).

The amendment followed a Supreme Court decision holding that the President had authority to refuse to validate passports for travel to Cuba. *Zemel* v. *Rusk,* 381 U.S. 1 (1965). The Senate committee that added the amendment said that it intended to make "the freedom-of-travel principle . . . a matter of law." S. Rep. No. 842, 95th Cong., 2d Sess. 14 (1978). Nevertheless, the Supreme Court has recently confirmed that the President has broad power over the issuance and revocation of passports. *Haig* v. *Agee,* 453 U.S. 280 (1981).

The President's power has been delegated to the Secretary of State pursuant to Executive Order No. 11,295, 31 Fed. Reg. 10,603 (1966). On December 9, 1981, Acting Secretary of State Clark restricted the use of United States passports for travel in Libya by placing a notice to that effect in the Federal Register. 46 Fed. Reg. 60,712 (1981). The notice said that the action was required by the unsettled state of relations with Libya, and the increased threat of hostile acts against Americans. It noted that the American Embassy in Libya remains closed and that the U.S. government is not in a position to provide diplomatic protection or consular assistance to Americans in Libya. Therefore there was an imminent danger to the physical safety of Americans travelling to or present in Libya.

In April, 1980, shortly before the rescue mission to Iran, President Carter authorized the restriction of the use of passports for travel to Iran. Exec. Order No. 12,211, *supra,* 45 Fed. Reg. 26,685 (1980). This restriction was lifted at the time of the hostage release agreement in January, 1981. The order did not prove to be successful in deterring some Americans from traveling to Iran. On May 31, 1980, while the hostages were being held and the travel restriction was in effect, former Attorney General Ramsey Clark led a group of ten U.S. citizens to Iran to participate in an international conference. The Attorney General decided earlier this year not to litigate the question of whether this group had violated various federal laws.

The Passport Act itself provides no penalty for its violation. It is a crime "to use any passport in violation of the conditions or restrictions therein contained . . . ." 18 U.S.C. § 1544. It is, however, difficult to enforce this law. It appears that, in order to have a successful prosecution, the government must prove that a U.S. passport that was geographically restricted was used to enter the country to which travel was restricted. Persons traveling to geographically restricted areas generally work out arrangements with the country of destination to admit them without presentation of the passport; if the passport is not used, no violation occurs. Even if the passport is used, evidence on this point is not likely to be available to prosecutors in the United States. State Department regulations do not list violation of area restrictions as a basis for revoking or denying a passport. 22 C.F.R. §§ 51.70–.71 (1981). It appears that the regulations could be amended so that violation of an

area restriction would be a ground for revocation. The problems of proof described for the criminal law would, however, apply here as well.

## D. Export Administration Act

The Export Administration Act of 1979, 50 U.S.C. App. §§ 2401–2413 (Supp. III 1979), contains three separate grants of power to the President to prohibit or curtail the export of goods and technology subject to the jurisdiction of the United States: national security controls, foreign policy controls, and short supply controls. 50 U.S.C. App. §§ 2404, 2405, 2406.

The provision likely to be most pertinent relates to foreign policy controls.[1] On October 23, 1981, foreign policy controls were imposed on exports of aircraft and aircraft parts to Libya. 46 Fed. Reg. 53,023 (1981) (to be codified at 15 C.F.R. §§ 376, 385, 399). Previously, off-highway tractors were restricted for sale to Libya under this section. 15 C.F.R. § 385.4(e) (1981).

This Act was not employed against Iran, but was recently used to restrict exports to the Soviet Union in 1980 following the invasion of Afghanistan. 45 Fed. Reg. 1883 (1980) (to be codified at 15 C.F.R. §§ 376, 386, 399) (Restriction on the Export of Agricultural Commodities and Products to the U.S.S.R.); 45 Fed. Reg. 21,612 (1980) (to be codified at 15 C.F.R. §§ 371, 379, 385, 399) (Controls on Goods and Technology for Moscow Olympics).

The President may prohibit exports "to the extent necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations." 50 U.S.C. App. § 2405(a)(1). One of the expressly permitted purposes of foreign policy controls is discouraging the provision of aid or sanctuary to international terrorists. 50 U.S.C. App. § 2402(8).

The President's authority to impose foreign policy controls has been delegated to the Secretary of Commerce. Exec. Order No. 12,214, 45 Fed. Reg. 29,783 (1980). It must be exercised, however, in consultation with the Secretary of State. 50 U.S.C. App. § 2405(a) (Supp. III 1979).

---

[1] National security controls may be imposed in order to restrict the export of goods and technology which would make "a significant contribution to the military potential of any other country," which would prove detrimental to the United States, 50 U.S.C. App. § 2402(2)(B), and which pertain to "militarily critical goods and technologies," 50 U.S.C. App. § 2404(d)(1). The Secretary cannot require a validated license unless (A) the export is restricted under a multilateral agreement; (B) with respect to the export, other nations do not possess capabilities comparable to those of the United States; or (C) the United States is seeking agreement of other suppliers to apply comparable controls 50 U.S.C. App. § 2404(e)(2). If the President determines that goods or technology are available from foreign sources so that a specific licensing requirement would be ineffective, he may still impose controls if he finds that "the absence of export controls . would prove detrimental to the national security of the United States " 50 U.S.C. App. § 2404(f)(1).

Short supply controls are used "to restrict the export of goods where necessary to protect the domestic economy from the excessive drain of scarce materials and to reduce the serious inflationary impact of foreign demand " 50 U.S.C. App. § 2402(2)(C)

Certain criteria must be considered when imposing or expanding such controls. They include:

> (1) The probability that they will achieve their purpose;
>
> (2) Compatibility with foreign policy including the effort to counter terrorism;
>
> (3) The reaction of other countries;
>
> (4) The impact on the ability of the United States to compete economically including the effect on existing contracts;
>
> (5) Ability to enforce the controls effectively; and
>
> (6) The foreign policy consequences of not imposing controls.

50 U.S.C. App. § 2405(b).

The Secretary of Commerce must, in addition, take the following steps:

> (a) Consult with affected industries concerning items (1) and (4), *supra;*
>
> (b) Determine that reasonable efforts have been made to achieve the purposes of the controls through negotiations or other alternative means;
>
> (c) Consult "in every possible instance" with the Congress;
>
> (d) Notify Congress of the action taken; and
>
> (e) Submit a report on items (1) through (6), *supra,* and on alternative means attempted or the reason for imposing the control without attempting alternative means. The report must also indicate how such controls will significantly further the foreign policy of the United States or will further its international obligations.
>
> (f) Take all feasible steps to initiate and conclude negotiations with appropriate foreign governments to control exports by them of comparable goods or technology.

50 U.S.C. App. § 2405(c), (d), (e).

Criminal violators of restrictions issued for foreign policy purposes can be punished by a fine of five times the value of the export or $100,000, whichever is greater, and imprisoned for up to 10 years. Officers of corporations are not specifically covered by the penalty provision but under general principles of law can be prosecuted as violators. 18 U.S.C. § 2. *Wood* v. *United States,* 204 Fed. 55 (4th Cir. 1913), *cert. denied,* 229 U.S. 617. In addition, civil fines of up to $10,000 may be imposed by the Commerce Department. Administrative sanctions are also available including revocation of the authority to export goods or technology. 50 U.S.C. App. § 2410(b), (c).

## E. The War Powers Resolution

The War Powers Resolution, 50 U.S.C. §§ 1541–1548, deals with the *procedures* which must be followed in the use of our armed forces. It includes requirements to consult with and report to Congress.

1. *Consultation.* The consultation requirement focuses on use of troops in hostile situations:

> The President in every possible instance shall consult with Congress before introducing United States Armed Forces into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, and after every such introduction shall consult regularly with the Congress until United States' Armed Forces are no longer engaged in hostilities or have been removed from such situations.

50 U.S.C. § 1542.

On its face, consultation is required with "Congress." This language replaced an earlier version which merely required consultation with the leadership and appropriate committees of Congress. H.R. Conf. Rep. No. 547, 93rd Cong., 1st Sess. 8 (1973); H.R. Rep. No. 287, 93rd Cong., 1st Sess. 6 (1973). Nevertheless, as a practical matter consultation with any more than a select group of congressional leaders has never been attempted.

In requiring consultation in "every possible instance," Congress meant to be firm yet flexible. H.R. Rep. No. 287, *supra*, at 6. The House report noted:

> The use of the word "every" reflects the committee's belief that such consultation *prior* to the commitment of armed forces should be inclusive. In other words, it should apply in extraordinary and emergency circumstances—even when it is not possible to get formal congressional approval in the form of a declaration of war or other specific authorization.
>
> At the same time, through use of the word "possible" it recognizes that a situation may be so dire, *e.g.,* hostile missile attack underway, and require such instantaneous action that no prior consultation will be possible.

*Id.*

President Carter determined that consultation was not "possible" prior to the Iran rescue mission because of the great need for secrecy. He indicated, however, that if the mission had not been aborted in its

first phase, he planned to advise appropriate congressional leaders before the next phase, the actual rescue, took place.[2]

Consultation is only required prior to the actual "introduction" of forces into hostilities. Thus, it is not required during planning or preparation stages as long as forces have not been committed.

A determination must also be made as to when hostilities exist that require consultation. President Ford took the position, for example, that no consultation was legally required at the Danang or Lebanon evacuations because hostilities were not involved. Franck, *After the Fall: The New Procedural Framework for Congressional Control Over the War Power*, 71 Am. J. Int'l L. 605, 615 (1977). The State and Defense Departments have said that "hostilities" mean a situation in which American forces are actively exchanging fire with opposing units and "imminent hostilities" mean a situation where there is a serious risk from hostile fire to the safety of U.S. forces. Neither term was thought to encompass irregular or infrequent violence which may occur in a particular area. *War Powers: A Test of Compliance, Relative to the Danang Sealift, the Evacuation of Phnom Penh, the Evacuation of Saigon, and the Mayaguez Incident, Hearings Before the Subcomm. on Int'l Security and Scientific Affairs of the House Comm. on Int'l Relations*, 94th Cong., 1st Sess. 38–39, 85–86 (1975).

2. *Reporting requirements.* The reporting requirements apply to situations not only where hostilities are taking place or imminent (which requires consultation) but where armed forces are sent to a foreign country equipped for combat. 50 U.S.C. § 1543. The report must be filed within 48 hours. This has been interpreted as meaning 48 hours from the time that they are "introduced" into the situation triggering the requirement and not from the time that the decision to dispatch them is made. *E.g.,* Franck, *supra,* at 615. The report must include:

    (1) The circumstances necessitating the introduction of United States Armed Forces;

    (2) The constitutional or legislative authority under which such introduction took place; and

    (3) The estimated scope and duration of the hostilities or involvement.

Franck, *supra,* at 614–15.

Reports filed in the past have been brief and to the point; they have not run more than one or two pages. The discussion of legal authority in the reports has been limited to a brief reference to the constitutional power of the President as Commander-in-Chief and Chief Executive. This Admin-

---

[2] Statement of Acting Secretary of State Christopher, May 8, 1980, to Senate Foreign Relations Comm., p. 5. Although the Acting Secretary's statement was phrased in statutory terms, the consultation requirement raises a constitutional question as to a possible limit on the President's independent power. Testimony of State Department Legal Adviser Monroe Leigh in *War Powers: A Test of Compliance, supra,* at 100

istration took the position that the incident earlier this year where two Libyan planes were shot down over the Mediterranean did not implicate either the consultation or reporting provisions.

The resolution includes in its statement of purpose and policy a list of situations in which the President is authorized to introduce the Armed Forces into hostilities or situations of imminent hostility. This may be done: (1) pursuant to a declaration of war; (2) under specific statutory authorization, or (3) in a national emergency created by an attack upon the United States, its territories or possesions or its armed forces. 50 U.S.C. § 1541(c). We do not believe, however, that the purpose and policy statement should be construed to constrain the exercise of the President's constitutional power. The Resolution's policy statement is not a comprehensive or binding formulation of the President's powers as Commander-in-Chief. *See* H.R. Conf. Rep. 547, 93rd Cong., 1st Sess. 8 (1973) (stating that subsequent sections of the Resolution are not dependent on the policy statement). The Resolution itself disclaims any intent to alter the constitutional power of the President. 50 U.S.C. § 1547(d)(1).

Finally, the Resolution provides that Congress may, by concurrent resolution, force the withdrawal of our armed forces from abroad. 50 U.S.C. § 1544(c). This "legislative Veto" device is, in our view, unconstitutional. *See* Veto of the War Powers Resolution, 1973 Pub. Papers of Richard Nixon 893 (Oct. 24, 1973).

### F. Powers Relating to Libyan Nationals

The Immigration and Nationality Act, 8 U.S.C. §§ 1101–1525 (1976 ed. and Supp. III 1979), provides the Executive with broad powers to restrict the entry of aliens into the United States and to deport them.

The President may issue regulations governing the entry and departure of aliens from the United States. It is unlawful

> for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe . . . .

8 U.S.C. § 1185(a)(Supp. III 1979). In addition, the President may suspend the entry of aliens by designated classes:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrant or nonimmigrants, or impose

441

on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

In the Iran crisis, the President delegated to the Secretary of State and the Attorney General the powers of the President under 8 U.S.C. § 1185 to prescribe limitations respecting visas issued to Iranians. Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (1979), as *amended by* Exec. Order No. 12,206, 45 Fed. Reg. 24,101 (1980). Under this order, the State Department issued regulations requiring all outstanding visas of Iranian nationals to be re-endorsed and for new visas to be issued only under strict standards. 22 C.F.R. § 46.8 (1981). Sections 1182 and 1185 were the authority for Proclamation 4865, 46 Fed. Reg. 48,107 (1981), and Executive Order No. 12,324, 46 Fed. Reg. 48,109 (1981) concerning interdiction of aliens on the high seas.

In addition, the Attorney General can issue regulations to carry out the immigration laws, 8 U.S.C. § 1103(a), and is charged with insuring that aliens who have not maintained their status under the law depart from the United States, 8 U.S.C. § 1184(a). These powers are delegated to the Commissioner of Immigration and Naturalization. 28 C.F.R. § 0.105 (1981). In 1979 the Immigration and Naturalization Service (INS) issued regulations requiring Iranian students to report to the INS and submit evidence that they had maintained eligibility as students under the immigration laws. 8 C.F.R. § 214.5 (1981). Subsequently, the INS provided for the accelerated departure of all Iranians who were judged deportable by limiting the amount of time permitted for departure. 8 C.F.R. § 242.5 (1981). These INS regulations were upheld in subsequent litigation as a valid exercise of the Attorney General's statutory power. The courts held that the regulations had a rational basis and did not therefore deprive Iranians of equal protection of the laws. *Narenji* v. *Civiletti,* 617 F.2d 745 (D.C. Cir. 1979), *cert. denied,* 446 U.S. 957 (1980); *Malek-Marzban* v. *INS,* 653 F.2d 113 (4th Cir. 1981); *cf. Yassini* v. *Crosland,* 618 F.2d 1356 (9th Cir. 1980).

Apart from the statute below dealing with enemy aliens, there is no law which specifically provides the power to expel aliens who are in this country lawfully as permanent residents or nonimmigrants and who are not otherwise subject to deportation.

The President has statutory authority to intern or expel enemy aliens. This power is available, however, only in time of war, invasion, or predatory incursion. 50 U.S.C. § 21. The Supreme Court has held this provision constitutional. *Ludecke* v. *Watkins,* 335 U.S. 160 (1948).

For your information, we are attaching: (1) examples of orders which have been issued in the past; and (2) a listing of major opinions, including subject headings issued by this Office during the Iranian

crisis. The latter attachment demonstrates the broad range of actions which were considered during that crisis.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*